UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| WATER REPLENISHMENT DISTRICT OF SOUTHERN CALIFORNIA, ) Plaintiff, ) v. ) ) 3M COMPANY (f/k/a Minnesota Mining and Manufacturing, Co.), AGC CHEMICALS AMERICAS, INC.; ARCHROMA, U.S., INC.; ARKEMA, INC., BUCKEYE FIRE EQUIPMENT COMPANY, CARRIER GLOBAL CORPORATION; CHEMGUARD, INC., CLARIANT CORPORATION; CORTEVA, INC. DUPONT DE NEMOURS, INC., DYNAX CORPORATION, E.I. DU PONT DE NEMOURS AND COMPANY, JOHN DOE DEFENDANTS 1-49, KIDDE FENWAL, INC., NATIONAL FOAM, INC., THE CHEMOURS COMPANY L.L.C. F/K/A THE CHEMOURS COMPANY, TYCO FIRE PRODUCTS LP (successor-in-interest to the Ansul Co.), and, UTC FIRE & SECURITY AMERICAS CORPORATION, INC. ) Defendants. ) | MDL No. 2873 Master Docket No. 2:18-mn-2873 Judge Richard Mark Gergel Civil Action No. 2:21-cv-03669-RMG COMPLAINT AND DEMAND FOR JURY TRIAL |

**COMPLAINT**
**(JURY TRIAL DEMANDED)**

**SUMMARY OF THE CASE**

1.     Plaintiff the WATER REPLENISHMENT DISTRICT OF SOUTHERN CALIFORNIA ("Plaintiff") is the largest groundwater agency in the state of California, managing and protecting local groundwater resources for over four million residents. Plaintiff was formed in 1959 for the purpose of protecting the groundwater resources of the Central and West Coast Groundwater Basins. Plaintiff protects the basins through groundwater replenishment, ensuring

the aquifers maintain healthy levels. It further protects the basins from seawater intrusion by injecting water into wells along the coastline to keep the ocean from further contaminating the fresh groundwater aquifers. Plaintiff routinely monitors the groundwater to ensure the quality meets all health standards. Plaintiff's service area covers a 420-square-mile region of southern Los Angeles County, the most populated county in the United States, which includes 43 cities. Plaintiff seeks to recover by this action the substantial costs necessary to protect the public and restore certain water supply wells, located in Plaintiff's service areas, which are contaminated with the synthetic per- and polyfluoroalkyl substances ("PFAS") perfluorooctanesulfonic acid ("PFOS") perfluorooctanoic acid ("PFOA"), and perfluorobutanesulfonic acid ("PFBS").

2.    Plaintiff brings this action in order to address widespread contamination of groundwater that provides drinking water to Plaintiff's producers, to recover costs associated with the contamination of drinking water, surface water, and groundwater with PFAS, and further seek abatement of the ongoing nuisance these chemicals constitute in the environment, and for such other action as is necessary to ensure that the PFAS that contaminate the surface water and aquifers supplying source drinking water for Plaintiff does not present a risk to the public. In this Complaint, the term PFAS is intended to include those compounds themselves (including all of their salts and ionic states as well as the acid forms of the molecules) and their chemical precursors.

3.    PFOA and PFOS are persistent, toxic, and bioaccumulative compounds when released into the environment. PFOA and PFOS have impacted surface water and groundwater, and now contaminate the water pumped from the Plaintiff's water supply wells.

4.    Defendants in this case are companies that designed, manufactured, marketed, distributed, and/or sold PFOA and PFOS, the chemical precursors of PFOA and PFOS, and/or products containing PFOA and PFOS, and/or their chemical precursors (collectively,

"Fluorochemical Products").

5.     Defendants' Fluorochemical Products made with PFAS include, but are not limited to, Teflon®, Scotchguard®, waterproofing compounds, stain-proofing compounds, waxes, paper and cloth coatings, and aqueous film-forming foam ("AFFF"), a firefighting agent used to control and extinguish Class B fuel fires.

6.     Defendants knew or reasonably should have known that their PFOA and PFOS compounds would reach groundwater, pollute drinking water supplies, render drinking water unusable and unsafe, and threaten the public health and welfare.

7.     Plaintiff files this lawsuit to seek abatement of an ongoing nuisance, to recover compensatory and all other damages and relief, including all necessary funds to compensate Plaintiff for the costs of investigating and remediating the contamination of drinking water supplies impacted by PFOA and PFOS; designing, constructing, installing, operating, and maintaining the treatment facilities and equipment required to remove PFOA and PFOS from public water supplies; and for such other damages and relief the Court may order. Such costs include all necessary funds to investigate, monitor, assess, evaluate, remediate, abate, or contain contamination of groundwater resources that are polluted with PFAS.

8.     Plaintiff divides the claims in this Complaint into three main categories: Counts 1–6 relate to AFFF and its intermediate products; Counts 7–11 relate to Fluorochemical Products other than AFFF and its intermediate products; and Counts 12–14 relate to 3M's operation of facilities in Monrovia, California and direct discharges of PFAS chemicals therefrom. Count 15 is a declaratory relief claim; and Counts 16–19 relate to a fraudulent transfer scheme engaged in by several of the defendants to avoid paying PFAS-related liabilities.

## PARTIES

9.      Plaintiff is the largest groundwater agency in the state of California, managing and protecting local groundwater resources for over four million residents. Plaintiff was formed in 1959 for the purpose of protecting the groundwater resources of the Central and West Coast Groundwater Basins. Plaintiff's mission is "to provide, protect, and preserve safe and reliable high-quality groundwater." Plaintiff protects the basins through artificial groundwater replenishment, ensuring that aquifers maintain healthy levels. It further protects the basins from seawater intrusion by injecting water into wells along the coastline to keep the ocean from further contaminating the fresh groundwater aquifers. Plaintiff routinely monitors the groundwater to ensure the quality meets all health standards. Plaintiff's service area covers a 420-square-mile region of southern Los Angeles County, the most populated county in the United States. The 43 cities in the service area, including a portion of the City of Los Angeles, use about 250,000 acre-feet (82 billion gallons) of groundwater annually, which accounts for approximately half of the region's water supply.

10.     Plaintiff has instituted a PFAS Remediation Program, through which it is working with water providers to address PFOA and PFOS in groundwater and to ensure that all potable water meets state and federal drinking water standards and is safe to drink. Last year, Plaintiff's Board of Directors approved a $34 million grant program to address wells that have been contaminated with PFOA and PFOS, through which those with affected wells can apply for assistance.

11.     The Legislature authorized Plaintiff, for the purpose of protecting and preserving the groundwater supplies within the district for beneficial uses, to " take any action, within the district, including, but not limited to, capital expenditures and legal actions, which in the

discretion of the board is necessary or desirable to accomplish any of the following: (a) Prevent contaminants from entering the groundwater supplies of the district, whether or not the threat is immediate. (b) Remove contaminants from the groundwater supplies of the district. (c) Determine the existence, extent, and location of contaminants in, or which may enter, the groundwater supplies of the district. (d) Determine persons, whether natural persons or public entities, responsible for those contaminants. (e) Perform or obtain engineering, hydrologic, and scientific studies for any of the foregoing purposes." Water Code § 60224.

12.     The Legislature also expressly granted Plaintiff the ability to sue and recover the amount of any district expenditures under Section 60224 from those responsible for the contaminants causing expenditures, including attorney's fees and costs. Water Code, section 60226, 60230.

13.     Plaintiff has protectable legal interests in the groundwater within the Basins, including the right to replenish the aquifer and to recover the costs of performing these services from anyone who appropriates groundwater in Plaintiff's service area. Plaintiff's service area is depicted below.



14.     Plaintiff has conducted, and will continue to conduct, investigations of the quality of the groundwater within the Basins, to perform any necessary investigation, cleanup, abatement, or remedial work to prevent, abate, or contain any threatened or existing contamination or pollution of the surface water or groundwater within its territorial jurisdiction; to further delineate the contamination within the Basins; to design and implement remedial systems to clean up the contamination; to acquire access and property rights necessary to install wells and other equipment to extract and convey the contaminated water; to construct treatment systems to remove the contaminants; and to operate and maintain those treatment systems until the cleanup is complete. Plaintiff seeks to protect the surface water and groundwater resources

from the threat of further pollution by taking response actions aimed at stopping the horizontal and vertical migration of and remediating the contaminants.

15.     Upon information and belief, Defendants' Fluorochemical Products, including but not limited to PFOA and PFOS containing fluorochemicals/intermediates and AFFF were used at least fire training facilities, at fire departments, and airports within the Basin, such that those compounds traveled by surface, groundwater, and other pathways toward wells within Plaintiff's service area ("contaminated water resources"). Defendants' Fluorochemical Products were also used and disposed of in and around the Basin, including at multiple landfills in the Basin such that surface, groundwater, and other pathways caused PFAS to contaminate wells within Plaintiff's service area. Finally, Defendants' Fluorochemical Products have been used and disposed of into wastewater systems, causing contamination to surface and groundwater in the Basin that traveled to wells within Plaintiff's service area.

16.     Defendant 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M") is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 3M Center, St. Paul, Minnesota 55133 but registered to do business in the California.

a.     Beginning before 1970 and until at least 2002, 3M manufactured, distributed, and sold Fluorochemical Products. 3M manufactured, distributed, and sold AFFF containing PFOS. 3M was the only company that manufactured or sold AFFF containing PFOS.

b.     3M has also researched, developed, manufactured, designed, marketed, distributed, released, promoted, and/or otherwise sold products and raw materials containing PFAS in markets around the country, including within California since at least

7

the 1970s. These product and raw material sales were based on intentional direction at the California market for these products and raw materials and availment of California laws.

c.    3M also operates two manufacturing facilities within proximity to several contaminated wells within Plaintiff's service area at 2724 Peck Road ("Oral Care Facility") and 1601 South Shamrock, Ave. ("Tape Facility") in Monrovia, California (together "3M Monrovia Facilities"). The Monrovia Oral Care Facility, on information and belief, manufactures dental products, including some that have contained PFAS. The site formerly belonged to the Uniteck Corporation which was a worldwide supplier of orthodontic products. 3M purchased Uniteck from Bristol-Myer in 1987. The 3M Tape Facility, on information and belief, currently manufactures tape and other adhesives that have at times contained PFAS, and over the years of its operations may have also coated fabrics with PFAS chemicals and manufactured other Fluorochemical Products. The below image depicts the 3M Monrovia Facilities.



d.     Based on information and belief, 3M has additional facilities in Irvine,

California; Corona, California; and Northridge, California.

17.     Defendant Tyco Fire Products LP ("Tyco") is a limited partnership formed in the

State of Delaware with its principal place of business at One Tyco Park, Exeter, NH 03833. Tyco

is an indirect subsidiary ultimately wholly owned by Johnson Controls International plc, an Irish

public limited company listed on the New York Stock Exchange [NYSE: JCI]. Tyco is the

successor in interest of The Ansul Company ("Ansul"), having acquired Ansul in 1990. (Ansul

and Tyco, as the successor in interest to Ansul, will hereinafter be collectively referred to as

"Tyco/Ansul.") Beginning in or around 1975, Ansul manufactured and/or distributed and sold

AFFF that contained fluorochemical surfactants containing PFOA. After Tyco acquired Ansul in 1990, Tyco/Ansul continued to manufacture, distribute, and sell AFFF that contained fluorocarbon surfactants containing PFOA. Tyco does business throughout the United States and is registered to do business in the state of California.

18.    Defendant Chemguard is a Wisconsin corporation with its principal place of business at One Stanton Street, Marinette, Wisconsin 54143. Beginning in or around 1994, Chemguard began manufacturing AFFF that contained PFOA. Upon information and belief, Chemguard manufactured, distributed, and/or sold AFFF foam containing PFOA.

19.    Defendant Buckeye Fire Equipment Company ("Buckeye") is a foreign corporation organized and existing under the laws of the State of Ohio, with its principal place of business at 110 Kings Road, Kings Mountain, North Carolina 28086. Beginning in or around 2004, Buckeye manufactured, distributed, and/or sold AFFF containing PFOA. Buckeye does business throughout the United States and is registered to do business in California.

20.    Defendant Kidde-Fenwal, Inc. ("Kidde-Fenwal") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 400 Main Street, Ashland, MA 01721. Kidde-Fenwal is the successor-in-interest to Kidde Fire Fighting, Inc. (f/k/a Chubb National Foam, Inc. f/k/a National Foam System, Inc.). Kidde-Fenwal does business throughout the United States and is registered to do business in California.

21.    Defendant National Foam, Inc. (a/k/a Chubb National Foam) is a Pennsylvania corporation, having a principal place of business at 350 East Union Street, West Chester, Pennsylvania 19382. National Foam manufactures the Angus brand of products and is the successor-in-interest to Angus Fire Armour Corporation (collectively, "National Foam/Angus Fire"). At all relevant times, National Foam manufactured fire suppression products, including

AFFF that contained PFAS compounds.

22.     Defendant Arkema, Inc. ("Arkema") is a corporation organized and existing under the laws of Pennsylvania, having a principal place of business at 900 First Avenue, King of Prussia, PA 19406. Arkema and/or its predecessors manufactured fluorosurfactants used in AFFF. Arkema is a successor in interest to Atochem North American, Inc., Elf Atochem North America, Inc., and Atofina Chemicals, Inc. and does and/or has done business throughout the United States and is registered to business in the state of California.

23.     AGC Chemicals Americas Inc. ("AGC") is a corporation organized and existing under the laws of Delaware, having a principal place of business in 5 East Uwchlan Avenue, Suite 201, Exton, PA 19341. AGC and/or its affiliates manufactured fluorochemicals used in AFFF. AGC does and/or has done business throughout the United States. On information and belief, AGC is the North American subsidiary of AGC Inc. (f/k/a Asahi Glass, Co., Ltd.) and does business throughout the United States and is registered to do business in the state of California.

24.     Defendant Dynax Corporation ("Dynax") is a corporation organized and existing under the laws of Delaware, having a principal place of business at 79 Westchester Avenue, Pound Ridge, New York 10576 and an address for service of process at 103 Fairview Park Drive Elmsford, New York 10523-1544. Dynax manufactured fluorosurfactants used in AFFF and does and/or has done business throughout the United States.

25.     Defendant Clariant Corporation ("Clariant") is a corporation organized and existing under the laws of New York, having a principal place of business at 4000 Monroe Road, Charlotte, North Carolina. Clariant manufactured fluorochemicals used in AFFF. On information and belief, Clariant was formerly known as Sandoz Chemicals Corporation and as Sodyeco, Inc

and does and/or has done business throughout the United States and is registered to do business in the state of California.

26.    Defendant E. I. du Pont de Nemours and Company ("Old DuPont") is a corporation duly organized under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. Old DuPont has done business throughout the United States, including conducting business in California, and is registered to do business in California.

    a.    Old DuPont has been involved in the production and sale of fluorochemical intermediaries for use in AFFF manufacturing since the 1950s. When 3M left the market, Old DuPont took on a larger role in the AFFF market.

    b.    Old DuPont has also manufactured, distributed, and sold Fluorochemical Products and raw PFAS chemicals around the country pursuant to a nationwide marketing campaign, including in California.

27.    Defendant The Chemours Company ("Chemours") is a corporation duly organized under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19899. Chemours does business throughout the United States, including conducting business in California, and is registered to do business in California.

    a.    Chemours was a wholly owned subsidiary of Old DuPont. In July 2015, Old DuPont completed its spin-off of Chemours as a separate publicly traded entity.

    b.    Chemours has received and begun manufacturing certain product lines from Old DuPont, including some product lines involving manufacture, sale, and distribution of PFAS-containing intermediates and Fluorochemical Products.

c.      In connection with the spin-off, Chemours assumed direct liability for Old DuPont's decades long history of causing widespread PFAS contamination in California, around the country, and indeed the world.

28.    Defendant DuPont de Nemours, Inc., formerly known as DowDuPont Inc. ("New DuPont") is a corporation duly organized under the laws of the State of Delaware, with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805. New DuPont does business throughout the United States.

a.      New DuPont assumed direct liability for Old DuPont's decades long history of causing widespread PFAS contamination in California, around the country, and indeed the world.

29.    Defendant Corteva, Inc. ("Corteva") is a corporation duly organized under the laws of the State of Delaware, with its principal place of business located at 974 Center Road, Wilmington, Delaware 19805. Corteva does business throughout the United States, including conducting business in California, and is registered to do business in California.

a.      Corteva assumed direct liability for Old DuPont's decades long history of causing widespread PFAS contamination in California, around the country, and indeed the world.

30.    Upon information and belief, Defendant John Does 1-49 were manufacturers, distributors, and/or sellers of Fluorochemical Products, including AFFF. Although the identities of the John Doe Defendants are currently unknown, Plaintiff expects that their names will be ascertained during discovery, at which time Plaintiff will move for leave of this Court to add those entities' actual names to the complaint as defendants.

31.    Defendants 3M, Chemguard, Tyco, Buckeye, Kidde-Fenwal, and National Foam

are companies that manufactured AFFF that entered into the stream of commerce, including in California, and was used by municipal and other fire departments, airports, and other agencies in fire training such that the PFOA and PFOS it contained ultimately traveled to the water within Plaintiff's service area. Collectively 3M, Chemguard, Tyco, Buckeye, Kidde-Fenwal, and National Foam are referred to as the "AFFF Defendants."

32.    Defendants Old DuPont, Chemours, Arkema, AGC, Dynax, Chemguard, and Clariant manufactured, distributed, and/or sold fluorosurfactants and/or other fluorochemical intermediates for use in the manufacture of AFFF by some or all of the AFFF Defendants. Old DuPont and Chemours are referred to collectively in this Complaint as "Old DuPont/Chemours." Old DuPont/Chemours, Arkema, AGC, Dynax, Chemguard, and Clariant are referred to collectively in this Complaint as the "Surfactant/Intermediary Defendants." This category of Defendant also includes New Dupont and Corteva to the extent they have assumed Old DuPont's PFAS-related liabilities.

33.    Collectively, the Surfactant/Intermediary Defendants and the AFFF Defendants are referred to as the "Fire-Product Defendants."

34.    When 3M, Old DuPont, Chemours, New DuPont, and Corteva are referred to for their liability (or assumption of liability) for their manufacture, distribution, marketing, and sale of Fluorochemical Products other than AFFF and Surfactant/Intermediates shall collectively be referred to as "Fluorochemical Product Defendants."

35.    In addition, Plaintiff asserts claims under the former Uniform Fraudulent Transfer Act, formerly California Civil Code Section 3439, *et seq.* ("UFTA") and the superseding Uniform Voidable Transactions Act, California Civil Code Section 3439, *et seq.* ("UVTA"), based on a web of transactions that Old DuPont orchestrated to shield significant assets from the

Plaintiff and other creditors.

36.    Old DuPont has known for decades that it faces unprecedented liabilities for widespread perfluoroalkyl and polyfluoroalkyl substances ("PFAS") contamination throughout the country, including, but not limited to, damage to public water systems, drinking water sources, and other contaminated water resources. Despite this knowledge, Old DuPont has sought, and continues to seek, however possible, to prevent injured public water systems like those that Plaintiff owns and operates from being able to recover on their eventual judgments.

37.    Old DuPont has sought to limit its PFAS liability by engaging in a series of complex restructuring transactions, including, but not limited to: (i) the "spinoff" of its Performance Chemicals Business (which included Teflon®, and other products, the manufacture of which involved the use of PFOA and other PFAS) into Defendant Chemours; (ii) a purported merger with The Dow Chemical Company ("Old Dow"); (iii) the transfer of Old DuPont's historic assets to other entities, including Defendant New DuPont; and (iv) ultimately, the spin-off of Old DuPont to a new parent company named Corteva, Inc. These transactions were all designed to shield billions of dollars in assets from the PFAS liabilities that Old DuPont tried to isolate in Chemours.

38.    Old DuPont also sought to hide critical details of these transactions by burying them in non-public schedules to agreements in an attempt to keep the parties such as Plaintiff in the dark. As a result, Old DuPont has shed more than $20 billion in tangible assets through restructuring efforts and attempted to put those assets outside of Plaintiff's reach. This is the exact type of scheme that the UFTA is designed to prevent and/or unwind.

## JURISDICTION AND VENUE

39.    This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

40.     Plaintiff is filing this complaint as permitted by Case Management Order No. 3 (CMO 3) issued by Judge Richard M. Gergel of this Court. Pursuant to CMO 3, Plaintiff designates the United States District Court for the Central District of California as the "home venue" where Plaintiff would have otherwise filed suit pursuant to 28 U.S.C. § 1391. But for CMO 3, venue is proper in the United States District Court for the Central District of California in that the events or omissions giving rise to the claim occurred in that district. Plaintiff respectfully requests that at the time of the transfer of this action back to trial court for further proceedings, this case be transferred to the United States District Court for the Central District of California.

41.     The United States District Court for the Central District of California has personal jurisdiction over the Defendants because at all times relevant to this lawsuit, the Defendants manufactured, designed, marketed, distributed, released, promoted and/or otherwise sold (directly or indirectly) PFAS-containing Fluorochemical Products, including AFFF, to various locations, such that each Defendant knew or should have known that said products would be delivered to areas in the State of California for active use including, but not limited to, during the course of training and firefighting activities, including areas within Plaintiff's service area.

42.     Plaintiff is informed and believes, and based thereon alleges that, at all relevant times, the Defendants engaged in and were authorized to do business in the State of California.

43.     Plaintiff is informed and believes, and based thereon alleges that, at all relevant times, the Defendants have engaged in substantial, continuous economic activity in California, including the business of researching, designing, formulating, handling, disposing, manufacturing, labeling, using, testing, distributing, promoting, marketing, selling, and/or otherwise being responsible for PFAS, and/or products that contain PFAS, and that said activity

by the Defendants is substantially connected to the Plaintiff's claims as alleged herein.

44.     Based on information and belief, the Defendants purposefully affiliated themselves with the forum of the State of California giving rise to the underlying controversy. Such purposeful availment and activities within and related to the State of California are believed to include, but are not limited to: 1) the Defendants' contractual relationships with the entities giving rise to researching, designing, formulating, handling, disposing, manufacturing, labeling, using, testing, distributing, promoting, marketing, selling, and/or otherwise being responsible for PFAS, and/or products that contain PFAS, and that said activity is substantially connected to the Plaintiff's claims as alleged herein; 2) agreements between the Defendants and entities, institutions and thought leader academics within State of California regarding the PFAS, and/or products that contain PFAS where the Defendants contractually consented to have state courts within the State of California adjudicate disputes; 3) marketing, advertising, selling, and advising third-party sellers of, the PFAS, and/or products that contain PFAS, targeted specifically to consumers and businesses within the State of California; 4) lobbying, consulting, and advisory efforts on behalf of the Defendants with regard to the PFAS, and/or products that contain PFAS stemming from law firms and other agents in the State of California; and 5) and other actions by Defendants targeted to the State of California to be obtained through discovery and other means. As the location from which the Defendants' suit-related conduct arose, California has a substantial vested interest in the acts of the Defendants which led to the underlying controversy.

45.     At all times herein mentioned, the Defendants, each of them, had actual knowledge that each of the other Defendants was going to intentionally and negligently engage in the tortious misconduct and acts alleged in the causes of action set forth in this complaint, including but not limited to the acts, failures to act, misrepresentations and breaches of duties of

care owed by each of the Defendants to Plaintiff.

46.    Therefore, the exercise of jurisdiction over the Defendants by the United States District Court for the Central District of California does not offend traditional notions of fair play and substantial justice.

## BACKGROUND AND FACTUAL ALLEGATIONS
### THE PFAS COMPOUNDS

47.    WRD manages the Central and West Coast Groundwater Basins in order to support a variety of beneficial uses, including potable and non-potable water supply. Much of the potable water supply currently used within southern Los Angeles County is groundwater pumped from the Basins for use by persons and producers within Plaintiff's service area. Such groundwater is transported, reclaimed, purified, treated, injected, extracted, and otherwise managed by Plaintiff. Because Los Angeles County is located in a semi-arid area, it is essential that all reasonable efforts be put forth by Plaintiff, in cooperation with producers and water providers in its service area, to protect the quality and quantity of groundwater supplies and to facilitate maximum utilization of local water resources within Plaintiff's boundaries.

48.    PFAS are a family of chemical compounds containing fluorine and carbon atoms.

49.    PFAS have been prevalently used for decades in industrial settings and in the production of thousands of common household and commercial products that are heat resistant, stain resistant, long lasting, and water and oil repellant.

50.    The PFAS family of chemicals are entirely anthropogenic and do not exist in nature.

51.    PFOA and PFOS are PFAS that are known to have characteristics that cause extensive and persistent environmental contamination.

52.    Specifically, PFOA and PFOS are persistent, toxic, and bioaccumulative as well

as highly mobile in soil and groundwater.

53.     PFOA and PFOS are mobile in that they are soluble and do not easily adsorb (stick) to soil particles.

54.     PFOA and PFOS are readily transported through the air as well as the soil and into groundwater where they can migrate long distances.

55.     PFOA and PFOS are persistent in that they do not readily biodegrade or chemically degrade in the environment or in conventional treatment systems for drinking water or wastewater.

56.     PFOA and PFOS are thermally, chemically, and biologically stable in the environment and resistant to biodegradation, atmospheric photo-oxidation, direct photolysis, and hydrolysis.

57.     Once PFAS are applied, discharged, disposed of, or otherwise released onto land or into the air, soil, sediments, or water, they migrate through the environment and into groundwater and surface water.

58.     PFOA and PFOS resist natural degradation and are difficult and costly to remove from soil and water.

59.     PFOA and PFOS bioaccumulate, biopersist, and biomagnify in the food web including in people and other organisms.

60.     Exposure to PFOA and PFOS has been associated with several negative health outcomes in both humans and animals, including, but not limited to, the following:

        a.      Altered growth, learning, and behavior of infants and older children;

        b.      Lowering a woman's chance of getting pregnant;

        c.      Interference with the body's natural hormones;

      d.      Increased cholesterol levels;

      e.      Modulation of the immune system;

      f.      Increased risk of certain cancers; and

      g.      Increased risk of ulcerative colitis.

61.      Contamination from PFAS presents a threat to public health and the environment.

62.      In addition to drinking contaminated water, humans can be exposed to PFOA and PFOS through inhalation, ingestion of contaminated food, and dermal contact.

63.      PFOA and PFOS enter the environment from industrial facilities that use PFAS in the manufacture or production of other products.

64.      Releases of PFAS to land, air, and water from industrial sites are known pathways to the environment for PFOA and PFOS.

65.      Due to their widespread use in consumer and commercial products, PFOA and PFOS may also enter the environment from wastewater treatment facilities, after the products have been disposed to landfills, during the use of the products, or in other manners.

66.      On information and belief, PFAS have been released into the environment from these various pathways of contamination to surface and groundwater, including by the use of recycled wastewater and stormwater to recharge groundwater supplies, in and around contaminated wells within Plaintiff's service area.

67.      The California State Water Resources Control Board has concluded that, among the "major sources of PFAS" are: industrial sites, landfills, and wastewater treatment plants/biosolids. It elaborates: "PFAS can get into drinking water when products containing them are used or spilled onto the ground or into lakes and rivers. Once in groundwater, PFAS are easily transported large distances and can contaminate drinking wells. PFAS in the air can also

end up in rivers and lakes used for drinking water."

68.    For example, the State Water Resources Control Board has investigated landfills as potential sources of PFAS contamination, concluding that "investigation is necessary at and around landfills statewide to determine the presence of PFAS, their respective levels in leachate and groundwater, and to evaluate the impact of current and historic discharges from these facilities on groundwater quality," clearly indicating that within California, PFAS contamination is of concern near landfills, prompting the State to sample the same.

69.    In the same way that PFAS are released from consumer products through their disposal in landfills, PFAS are also released from consumer products directly into the wastewater stream, e.g., by laundering PFAS-coated clothing, through use of PFAS-containing home care products, like Scotchguard®, Stainmaster®, Polartec®, and Gore-tex® fabric coatings and cleaners, and through use of PFAS-containing cook wear, including Teflon®.

70.    Also, on information and belief, the Defendants, sold PFAS and/or PFAS-containing products to companies with California locations that Defendants knew or should have known would be used and/or disposed of in California.

71.    3M and Old DuPont branded products are sold throughout the United States and inside California based on nationwide marketing campaigns.

72.    Old DuPont (and later Chemours) branded intermediate products, including (for example) automobile-coating products, are sold to and applied within Los Angeles County at several different businesses, which coatings would have been applied at and pursuant to Old DuPont's (and later Chemours') instruction and, on information and belief, with training from Old DuPont (and later Chemours).

73.    As discussed further below, both 3M and Old DuPont have operations in

California. (https://www.dupont.com/locations.html#North%20America, identifying a Torrance location); https://www.dupont.com/locations/palo-alto-california-dupont-research-development-center.html, identifying a Palo Alto location; https://www.corteva.com/resources/media-center/bay-area-innovation-center-strengthens-rnd-presence.html, identifying a Hayward location). Old DuPont also engages in a research collaboration in California with the California Life Sciences Institute: http://califesciencesinstitute.org/dupont-industrial-biosciences-2/.

74.    This includes retail sales of products resulting from Defendants' intentional marketing activities aimed at California markets as well as Defendants' sales to third parties who ultimately incorporated PFAS compounds into a finished product, which the Defendants knew or should have known would be used and/or disposed of in California.

75.    In each of these circumstances, Defendants have directed PFAS or PFAS-containing products and intermediates to California consumers or businesses for consumption and disposal in California.

76.    All the while, the Defendants have known of health and environmental risks associated with PFAS compounds for decades but concealed that knowledge until it was exposed through litigation and regulatory action in relatively recent years.

77.    The Defendants' manufacture, distribution and/or sale of PFAS and/or products containing PFAS resulted in the release of PFAS into the environment.

78.    Through their involvement and/or participation in the creation of consumer or other commercial products and materials and related training and instructional materials and activities, the Defendants knew, foresaw, and/or should have known and/or foreseen that PFAS would contaminate the environment.

79.    The Defendants knew, foresaw, and/or should have known and/or foreseen that

their marketing, promotion, development, manufacture, distribution, release, training of users of, production of instructional materials about, sale and/or use of PFAS containing materials, including in California, would result in the contamination of the groundwater that is the primary source of water supply within Plaintiff's service area.

80.     The Defendants' products were unreasonably and inherently dangerous and the Defendants failed to warn of this danger.

## THE PLAINTIFF'S WATER RESOURCES

81.     On information and belief, contaminated water resources within Plaintiff's service area have been impacted by use and discharge of AFFF, including in the Main San Gabriel basin such that AFFF has traveled via surface, groundwater, and recharge water to contaminate wells within Plaintiff's service area, as well as from other Fluorochemical Products, PFAS sources, and pathways, including but not limited to the use of recycled water and stormwater contaminated with PFAS for groundwater recharge in the Basin, and impacts from nearby landfills.

82.     PFOA and PFOS have impacted surface water and groundwater, and now contaminate the water pumped from water supply wells within Plaintiff's service area.

83.     Because of the risks that PFAS pose to human health, the State of California regulates PFOA, PFOS, and PFBS in drinking water at very low levels and is poised to set an MCL for PFOA and PFOS.

84.     The State of California has established notification levels for PFAS, and PFBS are 6.5 parts per trillion ("ppt"), 5.1 ppt, and 500 ppt respectively, and response levels for PFAS, and PFBS at 40 ppt, 10 ppt, and 5,000 ppt respectively.

## 3M COMPANY'S MANUFACTURE AND DISTRIBUTION OF PFAS

85.    For most of the past seven decades through the early 2000s, 3M was the primary

manufacturer of PFOS in the United States.

86.    3M is the only known manufacturer of PFOS in the United States.

87.    3M began producing PFOS and PFOA as raw materials or ingredients that it used

to produce other products, or that it sold to third parties for use in other products.

88.    3M produced PFOS by electrochemical fluorination beginning in the 1940s.

89.    Electrochemical fluorination results in a product that contains and/or breaks down

into compounds containing PFAS.

90.    3M went on to market and promote PFAS and shipped PFAS to manufacturers,

including Old DuPont, throughout the United States, including California. 3M made enormous

profits from PFAS and products containing PFAS and shipped PFAS and products containing

PFAS to California as well as throughout the country for decades until announcing in 2000 that it

would cease production of PFOA and PFOS (described in more detail below).

## OLD DUPONT'S USE AND MANUFACTURE OF PFOA

91.    Beginning in 1951, Old DuPont began purchasing PFOA from 3M for use in the

manufacturing process for Old DuPont's name-brand product Teflon®, commonly known for its

use as a coating for non-stick cookware.

92.    Old DuPont has also used PFAS in other name-brand products such as

Stainmaster®, and manufactured a variety of PFAS-containing products, such as fluorochemical-

based surfactants used in AFFF, including through a telomerization process that included,

contained, degraded, or broke down into and/or generated PFOA.

93.    Although Old DuPont was fully aware that PFOA was an inherently dangerous

and toxic chemical for decades, it produced its own PFAS compounds for use in its manufacturing processes, including its initiation of PFOA production as 3M phased out production of PFOA.

94.     Old DuPont marketed and promoted PFAS, and it shipped PFAS and PFAS-containing products to manufacturers throughout the United States, including California. Old DuPont made enormous profits from PFAS and products containing PFAS and shipped PFAS and products containing PFAS to California as well as throughout the country for decades, including with PFOA, which Old DuPont publicly claimed to have stopped manufacturing in 2013.

## 3M'S KNOWLEDGE OF THE DANGERS OF PFAS

95.     In the 1950s, based on its own internal studies, 3M concluded that PFAS are "toxic."

96.     3M knew as early as the mid-1950s that PFAS bioaccumulate in humans and animals.

97.     By the early 1960s, 3M understood that some PFAS are highly persistent in the environment, meaning that they do not degrade.

98.     3M knew as early as 1960 that chemical wastes from its PFAS manufacturing facilities that were dumped to landfills would leach into groundwater and otherwise enter the environment. A 3M internal memo from 1960 described the company's understanding that such wastes "[would] eventually reach the water table and pollute domestic wells."

99.     As early as 1963, 3M was aware that its PFAS products were persistent in the environment and would not degrade after disposal.

100.    3M began monitoring the blood of its employees for PFAS, as early as 1976,

because 3M was concerned about health effects of PFAS.

101.    3M documents from 1977 relating to these worker tests further confirm that PFAS bioaccumulate.

102.    By at least 1970, 3M knew that its PFAS products were hazardous to marine life.

103.    One study of 3M's PFAS around this time had to be abandoned to avoid severe local pollution of nearby surface waters.

104.    In 1975, 3M found there was a "universal presence" of at least one form of PFAS in blood serum samples taken from across the United States.

105.    Because PFAS are not naturally occurring in any amount, anywhere on the planet, this finding unquestionably alerted 3M to the near inevitability that its products were a pathway for widespread public exposure to its toxic ingredient—a likelihood that 3M considered internally but did not share outside the company.

106.    This finding also alerted 3M to the likelihood that this PFAS is mobile, persistent, bioaccumulative, and biomagnifying, as those characteristics would explain the ubiquitous presence of this PFAS from 3M's products in human blood.

107.    According to a deposition transcript in a lawsuit brought by the State of Minnesota against 3M [No. 27-cv-10-28862 (4th Judicial Dist. Ct. Hennepin Cty.)] ("Minn. Lawsuit") for damages to the state's natural resources from PFAS, 3M began monitoring the blood of its employees for PFAS, as early as 1976, because the company was "concerned" about "health" effects of PFAS. 3M documents from 1977 relating to these worker tests further confirmed that PFAS bioaccumulate.

108.    Other studies by 3M in 1978 showed that PFOA and PFOS are toxic to monkeys.

109.    In the late 1970s, 3M studied the fate and transport characteristics of PFOS in the

environment, including in surface water and biota.

110.    A 1979 report drew a direct line between effluent from 3M's Decatur, Alabama plant and PFAS bioaccumulating in fish tissue taken from the Tennessee River.

111.    3M resisted calls from its own ecotoxicologists going back to 1979 to perform an ecological risk assessment on PFOS and similar chemicals.

112.    3M's own ecotoxicologists continued raising concerns to 3M until at least 1999.

113.    In 1983, 3M scientists opined that concerns about PFAS "give rise to legitimate questions about the persistence, accumulation potential, and ecotoxicity of [PFAS] in the environment."

114.    In 1984, 3M's internal analyses demonstrated that PFAS were likely bioaccumulating in 3M fluorochemical employees.

115.    According to the Minnesota Attorney General, despite 3M's understanding of the risks associated with PFAS, 3M engaged in a campaign to distort scientific research concerning PFAS and to suppress research into the potential harms associated with PFAS.

116.    According to a deposition transcript from the Minn. Lawsuit, 3M recognized that if the public and governmental regulators became aware of the risks associated with PFAS, 3M would be forced to halt its manufacturing of PFAS and PFAS-derived products that would result in the loss of hundreds of millions of dollars in annual revenue.

117.    The potential loss of 3M's massive profits from PFAS drove 3M to engage in a campaign to influence the science relating to PFAS and, according to internal 3M documents, to conduct scientific "research" that it could use to mount "[d]efensive [b]arriers to [l]itigation."

118.    A key priority of an internal 3M committee—referred to as the FC Core Team—was to "[c]ommand the science" concerning "exposure, analytical, fate, effects, human health

and ecological" risks posed by PFAS and for 3M to provide "[s]elective funding of outside research through 3M 'grant' money."

119.    In exchange for providing grant money to friendly researchers, 3M obtained the right to review and edit draft scientific papers regarding PFAS and sought control over when and whether the results of scientific studies were published at all.

120.    A significant aspect of 3M's campaign to influence independent scientific research involved 3M's relationship with Professor John Giesy. 3M provided millions ofdollars in grants to Professor Giesy, who presented himself publicly as an independent expert but, as revealed in his deposition transcript in the Minn. Lawsuit, he privately characterized himself as part of the 3M "team."

121.    According to Professor Giesy's deposition transcript in the Minn. Lawsuit, Professor Giesy worked on behalf of 3M to "buy favors" from scientists in the field for the purpose of entering into a "quid pro quo" with the scientists.

122.    According to emails produced by Professor Giesy in the Minn. Lawsuit, through his position as an editor of academic journals, Professor Giesy reviewed "about half of the papers published in the area" of PFAS ecotoxicology and billed 3M for his time reviewing the articles and, in performing reviews of these articles, Professor Giesy stated that he was always careful to ensure that there was "no paper trail to 3M" and that his goal was to "keep 'bad' papers [regarding PFAS] out of the literature" because "in litigation situations" those articles "can be a large obstacle to refute."

123.    According to Professor Giesy's deposition transcript in the Minn. Lawsuit, despite spending most of his career as a professor at public universities, Professor Giesy has a net worth of approximately $20 million which is, according to the Minnesota Attorney General, in part, a

direct result from his long-term involvement with 3M for the purpose of suppressing independent scientific research on PFAS.

124.    3M's own employees recognized that 3M was concealing known dangers relating to PFAS. For example, in a 1999 resignation letter, an employee stated that "I can no longer participate in the process that 3M has established for the management of [PFAS.] For me, it is unethical to be concerned with markets, legal defensibility and image over environmental safety."

125.    In response to pressure from the United States Environmental Protection Agency ("EPA"), 3M began to phase out production of PFOS and PFOA products in 2000.

126.    Also on information and belief, 3M replaced PFOS with PFBS upon phase-out of PROS and PFOA.

127.    On May 16, 2000, 3M issued a news release asserting that "our products are safe," citing the company's "principles of responsible environmental management" as the reason to cease production.

128.    On the same day as 3M's phase-out announcement, an EPA press release stated: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term."

129.    In a memo explaining its decision, EPA stated that PFOS "appears to combine Persistence, Bioaccumulation, and Toxicity property to an extraordinary degree."

130.    3M knew or should have known that through their intended and/or common use, products containing PFAS would very likely injure and/or threaten public health and the environment in California.

## 3M MONROVIA FACILITIES

131.    As noted in Paragraph 16 above, 3M owns and operates two manufacturing

facilities in Monrovia.

132.    For the 3M Oral Care Facility, the following adhesives are listed on the plant's

website, Transbond Adhesive, APC Adhesive System, Transbond MIP Primer, Transbond Plus

Adhesive, APC II Adhesive System, APC PLUS Adhesive Coated Appliance System. The plant

website also indicates that Transbond PLUS Color Change Adhesive is a "3M Monrovia featured

product." PFAS are known to be present in adhesives.

133.     In addition to manufacturing adhesive products the 3M Oral Care Facility

website indicates that it utilizes CNC machining, laser cutting, laser welding, metal injection

molding, ceramic processing and brazing processing which suggests that metal fabrication is

occurring at this location. PFAS are known to be used as surfactants to clean metal surfaces in

industrial processes.

134.    Historically, fluoropolymers were processed using PFOA and PFOS.  3M

Innovate Properties Co. is the assignee of orthodontic patents which utilize fluoropolymers.  For

example, the abstract for 3M's 2004 U.S. Patent No. US20060105179A, indicates:

"Protective fluoropolymer layers for dental articles, particularly orthodontic appliances, that

include an elastomeric substrate, are provided that reduce adhesion of materials such as food

stains, bacteria and proteinaceous substances to these surfaces, which can cause staining.

Methods of reducing adhesion of these materials to such surfaces are also provided." The 3M

Oral Care Facility is a registered discharger with the California State Water Resources Control

Board.

135.    3M acquired the Tape Facility in 1953 and has operated it continuously, except in

1973 when it was temporarily closed because it lacked anti-smog equipment, resulting in

approximately 1,000 pounds of escaping pollutants. Based on publicly available records relating

to 3M's operations at this facility, fabrics were coated with resin at this facility and bottle linings

were applied as well. Each of these applications frequently involve the use of PFOS and PFOA.

The Tape Facility is listed as a discharger with the California State Water Resources Control

Board and has a NAICS code indicating it is a fabric coating mill.

136.    Both 3M Monrovia Facilities are adjacent to the Sawpit wash, which eventually

runs into the Rio Hondo River.

137.    Drinking and monitoring wells downgradient from these facilities, PFAS results

are higher than upgradient.

138.    At all relevant times, 3M failed and/or refused to report, investigate, control,

and/or remediate PFAS disposed of, or otherwise released from, 3M's Monrovia Facilities. As a

direct and proximate result thereof, Plaintiff has suffered damages including but not limited to

the following:

a.    Surface water used as a drinking water supply has become contaminated with

PFAS;

b.    Stormwater runoff detained for groundwater recharge has become contaminated

with PFAS; and

c.    Groundwater used as a drinking water supply for consumers within Plaintiff's

service area has become contaminated with PFAS;

139.    Despite awareness of the high levels of contamination, 3M failed to determine the

extent of the contamination and did not adequately remediate the offsite migration to prevent

contamination of drinking water wells or protect human health. 3M and its managing agents have

failed and refused to act to prevent contamination of surface water, groundwater, and drinking water supplies with full knowledge that failure to do so would cause contamination of drinking water supplies and property damage.

## OLD DUPONT'S KNOWLEDGE OF THE DANGERS OF PFAS AND MOUNTING LIABILITIES

140.    Beginning in the 1950s, Old DuPont manufactured, produced, or utilized PFOA and other PFAS at several facilities in the United States.

141.    Throughout this time, Old DuPont was aware that PFOA was toxic, harmful to animals and humans, bioaccumulative, and biopersistent in the environment. Old DuPont also knew that it directly emitted and discharged, and continued to emit and discharge, PFOA in large quantities into the environment from its manufacturing plants, such that hundreds of thousands of people had been exposed to its PFOA, including through public and private drinking water supplies.

142.    Old DuPont company scientists issued internal warnings about the toxicity associated with their PFAS products as early as 1961.

143.    Old DuPont's Toxicology Section Chief opined that such products should be "handled with extreme care," and that contact with the skin should be "strictly avoided."

144.    In 1978, based on information it received from 3M about elevated and persistent organic fluorine levels in workers exposed to PFAS, Old DuPont initiated a plan to review and monitor the health conditions of potentially exposed workers in order to assess whether any negative health effects could be attributed to PFAS exposure.

145.    This monitoring plan involved obtaining blood samples from the workers and analyzing them for the presence of organic fluorine.

146.    By 1979, Old DuPont had data indicating that its workers exposed to PFOA had a

significantly higher incidence of health issues than did unexposed workers.

147.    Old DuPont did not report this data or the results of its worker health analysis to any government agency or community.

148.    The following year, Old DuPont internally confirmed that PFOA "is toxic," that humans bioaccumulate PFOA in their tissue, and that "continued exposure is not tolerable."

149.    Not only did Old DuPont know that PFOA bioaccumulates in humans, but it was also aware that PFOA could cross the placenta from an exposed mother to her gestational child.

150.    In fact, Old DuPont had reported to EPA in March 1982 that results from a rat study showed PFOA crossing the placenta if present in maternal blood, but Old DuPont concealed the results of internal studies of its own plant workers confirming placental transfer of PFOA in humans.

151.    While Old DuPont knew about this toxicity danger as early as the 1960s, Old DuPont also was aware that PFAS was capable of contaminating the surrounding environment and causing human exposure.

152.    By at least 1981, Old DuPont also knew that PFOA could be emitted into the air from its facilities, and that those air emissions could travel beyond the facility boundaries and enter the environment and natural resources.

153.    By 1984, Old DuPont unquestionably was aware that PFOA is biopersistent.

154.    Old DuPont was long aware that the PFOA it was releasing from its facilities was leaching into groundwater used for public drinking water.

155.    After obtaining data on these releases and the resulting contamination near Old DuPont's Washington Works plant in West Virginia in 1984, Old DuPont held a meeting at its corporate headquarters in Wilmington, Delaware, to discuss health and environmental issues

related to PFOA (the "1984 Meeting").

156.   Old DuPont employees who attended the 1984 Meeting discussed available technologies that could control and reduce PFOA releases from its manufacturing facilities, as well as potential replacement materials.

157.   Old DuPont chose not to use either available technologies or replacement materials, despite knowing of PFOA's toxicity.

158.   During the 1984 Meeting, Old DuPont employees in attendance spoke of the PFOA issue as "one of corporate image, and corporate liability."

159.   They were resigned to Old DuPont's "incremental liability from this point on if we do nothing" because Old DuPont was "already liable for the past 32 years of operation."

160.   They also stated that the "legal and medical [departments within Old DuPont] will likely take the position of total elimination" of PFOA use in Old DuPont's business, and that these departments had "no incentive to take any other position."

161.   By 2000, Old DuPont's in-house counsel was particularly concerned about the threat of punitive damages resulting from Old DuPont's releases of PFOA at its Washington Works facility in West Virginia.

162.   Old DuPont's own Epidemiology Review Board repeatedly raised concerns about Old DuPont's statements to the public that there were no adverse health effects associated with human exposure to PFOA.

163.   For example, in February 2006, the Epidemiology Review Board "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis of [Old DuPont's] public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."

164.    In 2004, EPA filed an action against Old DuPont based on its failure to disclose toxicity and exposure information for PFOA, in violation of federal environmental laws.

165.    In 2005, Old DuPont eventually settled the action by agreeing to pay $10.25 million in a civil administrative penalty and to complete $6.25 million in supplemental environmental projects.

166.    The combined settlement resolved eight counts brought by the EPA alleging violations of the Toxic Substances Control Act and the Resource Conservation and Recovery Act concerning the toxicity of PFAS compounds.

167.    Old DuPont also promised to phase out production and use of PFOA by 2015.

168.    EPA called the settlement the "largest civil administrative penalty EPA has ever obtained under any federal environmental statute."

169.    Old DuPont and Chemours knew or should have known that in their intended and/or common use products containing PFAS would very likely injure and/or threaten public health and the environment in California.

170.    Also, in 2005, a final court order was entered approving Old DuPont's 2004 settlement in the class action lawsuit styled *Leach, et al. v. E.I. du Pont de Nemours & Co.*, Civil Action No. 01-C-608 (Wood Cty. W. Va. Cir. Ct.) (the "Leach Action") filed on behalf of approximately 70,000 individuals with PFOA-contaminated drinking water supplies in Ohio and West Virginia for benefits valued at over $300 million.

171.    Under the terms of the final class action settlement, Old DuPont agreed to fund a panel of independent scientists (the "C8 Science Panel") to conduct whatever studies were necessary to confirm which diseases were linked to class member PFOA exposure, to remove PFOA from the contaminated water sources, and to pay up to $235 million for medical

monitoring of class members with respect to any diseases linked by the C8 Science Panel to their PFOA exposure. "C-8," a term used internally by DuPont employees, is an alternative name for PFOA.

172.    After seven years of study and analyses, the C8 Science Panel confirmed that PFOA exposures among class members were linked to six serious human diseases, including two types of cancer.

173.    More than 3,500 personal injury claims were filed against Old DuPont in Ohio and West Virginia following the final settlement in the *Leach* Action and the findings of the C8 Science Panel.

174.    These claims were consolidated in the federal multidistrict litigation styled *In Re: E. I. du Pont de Nemours and Company C-8 Personal Injury Litigation* (MDL No. 2433) in the United States District Court for the Southern District of Ohio (the "C8 MDL").

175.    Between 2015 and 2016, juries in three bellwether trials in the C8 MDL returned multi-million-dollar verdicts against Old DuPont, awarding compensatory damages and, in two cases, punitive damages to plaintiffs who claimed PFOA exposure caused their cancers.

176.    As discussed below, Old DuPont required that Chemours both directly assume its historical PFAS liabilities and indemnify Old DuPont from those liabilities. Chemours explained in its November 2016 SEC filing: "[s]ignificant unfavorable outcomes in a number of cases in the [C8] MDL could have a material adverse effect on Chemours' consolidated financial position, results of operations or liquidity."

177.    On February 13, 2017, Old DuPont and Chemours agreed to pay $670.7 million to resolve the approximately 3,500 then-pending cases in the C8 MDL.

### OLD DUPONT'S MULTI-STEP, FRAUDULENT SCHEME
### TO ISOLATE ITS VALUABLE TANGIBLE ASSETS FROM ITS
### PFAS LIABILITIES AND HINDER CREDITORS

178.    By 2013, Old DuPont knew that it faced substantial environmental and other liabilities arising from its use of PFOA at Washington Works alone, as well as liability related to PFAS contamination at other sites and areas throughout the country, and its sale of products containing PFAS, and that its liability was likely billions of dollars.

179.    These liabilities include clean-up costs, remediation obligations, tort damages, natural resource damages and, most importantly, likely massive and potentially crippling punitive damages arising from Old DuPont's intentional misconduct.

180.    In light of this significant exposure, upon information and belief, by 2013 Old DuPont's management began to consider restructuring the company in order to, among other things, avoid responsibility for the widespread environmental harm and personal injuries that Old DuPont's PFAS and associated conduct caused, and to shield billions of dollars in assets from these substantial liabilities. Old DuPont referred to this initiative internally as "Project Beta."

181.    Upon information and belief, Old DuPont contemplated various restructuring opportunities, including potential merger structures. In or about 2013, Old DuPont and Old Dow began discussions about a possible "merger of equals."

182.    Upon information and belief, Old DuPont recognized that neither Old Dow, nor any other rational merger partner, would agree to a transaction that would result in exposing Old Dow, or any other merger partner, to the substantial PFAS liabilities that Old DuPont faced.

183.    Accordingly, Old DuPont's management decided to pursue a corporate restructuring strategy specifically designed to isolate Old DuPont's massive legacy liabilities from its valuable tangible assets in order to shield those assets from creditors and entice Old

Dow to pursue the proposed merger.

184.     Old DuPont engaged in a three-part restructuring plan, further explained below.

185.     The first step in Old DuPont's plan was to transfer its Performance Chemicals business (which included Teflon® and other products, the manufacture of which involved the use of PFOA and other PFAS) into its wholly-owned subsidiary, Chemours. And then, in July 2015, Old DuPont "spun-off" Chemours as a separate publicly traded entity and saddled Chemours with Old DuPont's massive legacy liabilities (the "Chemours Spinoff").

186.     Old DuPont knew that Chemours was undercapitalized and could not satisfy the massive liabilities that it caused Chemours to assume. Old DuPont also knew that the Chemours Spinoff alone would not isolate its own assets from its PFAS liabilities, and that Old DuPont still faced direct liability for its own conduct.

187.     Accordingly, Old DuPont moved on to the next step of its plan, designed to further distance itself from the exposure it had created over its decades of illicit conduct with regard to PFAS.

188.     The second step involved Old DuPont and Old Dow entering into an "Agreement and Plan of Merger" in December 2015, pursuant to which Old DuPont and Old Dow merged with subsidiaries of a newly-formed holding company, DowDuPont, Inc. ("DowDuPont"), which was created for the sole purpose of effectuating the merger. Old DuPont and Old Dow became subsidiaries of DowDuPont.

189.     Then, through a series of subsequent agreements, DowDuPont engaged in numerous business segment and product line "realignments" and "divestitures."

190.     The net effect of these transactions was to transfer, either directly or indirectly, a substantial portion of Old DuPont's assets to DowDuPont.

191.    The third step involved DowDuPont spinning off two, new, publicly-traded companies: (i) Corteva, which currently holds Old DuPont as a subsidiary, and (ii) Dow, Inc. ("New Dow") which currently holds Old Dow as a subsidiary. DowDuPont was then renamed New DuPont.

192.    As a result of these transactions, between December 2014 (pre-Chemours Spinoff) and December 2019 (post-Dow merger), the value of Old DuPont's tangible assets decreased by $20.85 billion.

193.    New DuPont and New Dow now hold the vast majority of the tangible assets that Old DuPont formerly owned.

194.    Many of the details about these transactions are hidden from the public in confidential schedules and exhibits to the various restructuring agreements. Upon information and belief, Old DuPont, New DuPont, New Dow, and Corteva have intentionally buried these details in an attempt to hide from creditors, like Plaintiff, where Old DuPont's valuable assets went and to hide the inadequate consideration that Old DuPont received in return.

**STEP 1: THE CHEMOURS SPINOFF**

195.    In February 2014, Old DuPont formed Chemours as a wholly-owned subsidiary. Chemours was originally incorporated on February 18, 2014, under the name "Performance Operations, LLC."

196.    On or about April 15, 2014, the company was renamed "The Chemours Company, LLC," and on April 30, 2015, it was converted from a limited liability company to a corporation named "The Chemours Company."

197.    Prior to July 1, 2015, Chemours was a wholly-owned subsidiary of Old DuPont. On July 1, 2015, Old DuPont completed the spinoff of its Performance Chemicals Business,

consisting of Old DuPont's Titanium Technologies, Chemical Solutions, and Fluoroproducts segments, and Chemours became a separate, publicly traded entity.

198.    The Performance Chemicals Business included fluorochemical products and the business segment that had manufactured, used, and discharged PFOA into the environment.

199.    Prior to the Chemours Spinoff, Chemours was a wholly-owned subsidiary of Old DuPont, and its Board of Directors had three members, all of whom were Old DuPont employees.

200.    On June 19, 2015, a fourth member of the Board was appointed, and upon information and belief, this fourth member had served as a member of Old DuPont's Board of Directors from 1998 to 2015.

201.    On July 1, 2015, effective immediately prior to the Chemours Spinoff, the size of the Chemours Board of Directors was expanded to eight members. The three initial Old DuPont employees resigned from the Board, and to fill the vacancies created thereby, seven new members were appointed.

202.    To effectuate the Chemours Spinoff, Old DuPont and Chemours entered into the June 26, 2015 Separation Agreement (the "Chemours Separation Agreement").

203.    Pursuant to the Chemours Separation Agreement, Old DuPont agreed to transfer to Chemours all businesses and assets related to the Performance Chemicals Business, including 37 active chemical plants.

204.    Old DuPont completed a significant internal reorganization prior to the Chemours Spinoff, such that all of the assets that Old DuPont deemed to be part of the Performance Chemicals Business would be transferred to Chemours.

205.    At the same time, Chemours accepted a broad assumption of liabilities for Old

DuPont's historical use, manufacture, and discharge of PFAS, although the specific details regarding the nature, probable maximum loss value, and anticipated timing of the liabilities that Chemours assumed are not publicly available.

206.    Notwithstanding the billions of dollars in PFAS liabilities that Chemours would face, on July 1, 2015, Chemours transferred to Old DuPont approximately $3.4 billion as a cash dividend, along with a "distribution in kind" of promissory notes with an aggregate principal amount of $507 million.

207.    Thus, in total, Chemours distributed $3.9 billion to Old DuPont. Chemours funded these distributions by entering into approximately $3.995 billion of financing transactions, including senior secured term loans and senior unsecured notes, on May 12, 2015. Also, Chemours distributed approximately $3.0 billion in common stock to Old DuPont shareholders on July 1, 2015 (181 million shares at $16.51 per share price).

208.    Accordingly, most of the valuable assets that Chemours may have had at the time of the Chemours Spinoff were unavailable to creditors with current or future PFAS claims, and Old DuPont stripped Chemours's value for itself and its shareholders. In total, Chemours transferred almost $7 billion in stock, cash, and notes to Old DuPont and its shareholders. Old DuPont, however, only transferred $4.1 billion in net assets to Chemours. And, Chemours assumed billions of dollars of Old DuPont's PFAS and other liabilities.

209.    In addition to the assumption of such liabilities, the Chemours Separation Agreement required Chemours to provide broad indemnification to Old DuPont in connection with these liabilities, which is uncapped and does not have a survival period.

210.    The Chemours Separation Agreement requires Chemours to indemnify Old DuPont against, and assume for itself, all "Chemours Liabilities," which is defined broadly to

include, among other things, "any and all Liabilities relating . . . primarily to, arising primarily out of or resulting primarily from, the operation or conduct of the Chemours Business, as conducted at any time prior to, at or after the Effective Date . . . including . . . any and all Chemours Assumed Environmental Liabilities . . . ," which includes Old DuPont's historic liabilities relating to and arising from its decades of emitting PFOA into the environment from Washington Works and elsewhere.

211.    The Chemours Separation Agreement also requires Chemours to indemnify Old DuPont against, and assume for itself, the Chemours Liabilities regardless of (i) when or where such liabilities arose; (ii) whether the facts upon which they are based occurred prior to, on, or subsequent to the effective date of the spinoff; (iii) where or against whom such liabilities are asserted or determined; (iv) whether arising from or alleged to arise from negligence, gross negligence, recklessness, violation of law, fraud or misrepresentation by any member of the Old DuPont group or the Chemours group; (v) the accuracy of the maximum probable loss values assigned to such liabilities; and (vi) which entity is named in any action associated with any liability.

212.    The Chemours Separation Agreement also requires Chemours to indemnify Old DuPont from, and assume all, environmental liabilities that arose prior to the spinoff if they were "primarily associated" with the Performance Chemicals Business.

213.    Chemours also agreed to use its best efforts to be fully substituted for Old DuPont with respect to "any order, decree, judgment, agreement or Action with respect to Chemours Assumed Environmental Liabilities . . . ."

214.    Notably, Chemours sued Old DuPont in Delaware state court in 2019, alleging, among other things, that if (i) the full value of Old DuPont's PFAS liabilities were properly

estimated and (ii) the Court does not limit Chemours' liability that the Chemours Separation Agreement imposes, then Chemours would have been insolvent at the time of the Chemours Spinoff.

215.   There was no meaningful, arms-length negotiation of the Separation Agreement.

216.   In its Delaware lawsuit, Chemours alleges that Old DuPont refused to allow any procedural protections for Chemours in the negotiations, and Old DuPont and its outside counsel prepared all the documents to effectuate the Chemours Spinoff. Indeed, during the period in which the terms of commercial agreements between Chemours and Old DuPont were negotiated, Chemours did not have an independent board of directors or management independent of Old DuPont.

217.   Although Chemours had a separate board of directors, Old DuPont employees controlled the Chemours board. Indeed, when the Chemours Separation Agreement was signed, Chemours was a wholly-owned subsidiary of Old DuPont, and the Chemours board consisted of three Old DuPont employees and one former, long-standing member of the Old DuPont board.

218.   Chemours' independent board of directors, newly appointed on July 1, 2015, immediately prior to the Chemours Spinoff, did not participate in the negotiations of the terms of the separation.

219.   It is apparent that Old DuPont's goal with respect to the Chemours Spinoff was to segregate a large portion of Old DuPont's legacy environmental liabilities, including liabilities related to its PFAS chemicals and products, and in so doing, shield Old DuPont's assets from any financial exposure associated therewith.

220.   Not surprisingly, given Old DuPont's extraction of nearly $4 billion from Chemours immediately prior to the Chemours Spinoff, Chemours was thinly capitalized and

unable to satisfy the substantial liabilities that it assumed from Old DuPont. Indeed, Chemours disclosed in public SEC filings that its "significant indebtedness" arising from its separation from Old DuPont restricted its current and future operations.

221.    Shortly after the Chemours Spinoff, market analysts described Chemours as "a bankruptcy waiting to happen" and a company "purposely designed for bankruptcy."

222.    At the end of December 2014, Chemours reported it had total assets of $5.959 billion and total liabilities of $2.286 billion. At the end of 2015, following the Chemours Spinoff, Chemours reported that it had total assets of $6.298 billion and total liabilities of $6.168 billion as of December 31, 2015, yielding total net worth of $130 million.

223.    Removing Chemours' goodwill and other intangibles of $176 million yields tangible net worth of negative $46 million (that is, Chemours' liabilities were greater than its tangible assets). According to unaudited pro forma financial statements, as of March 31, 2015 (but giving effect to all of the transactions contemplated in the Chemours Spinoff), Chemours had total assets of $6.4 billion and total liabilities of $6.3 billion.

224.    Chemours also reported that these liabilities included $454 million in "other accrued liabilities," which in turn included $11 million for accrued litigation and $68 million for environmental remediation. Chemours also had $553 million in "other liabilities," which included $223 million for environmental remediation and $58 million for accrued litigation.

225.    Chemours significantly underestimated its liabilities, including the liabilities that it had assumed from Old DuPont with respect to PFAS, and which Old DuPont and Chemours knew or should have known would be tens of billions of dollars.

226.    Had Chemours taken the full extent of Old DuPont's legacy liabilities into account, as it should have done, it would have had negative equity (that is, total liabilities that are

greater than total assets), not only on a tangible basis, but also on a total equity basis, and, Chemours would have been rendered insolvent at the time of the Chemours Spinoff.

**STEP 2: THE OLD DOW/OLD DUPONT "MERGER"**

227.    After the Chemours Spinoff, Old DuPont took the untenable position that it was somehow no longer responsible for the widespread PFAS contamination that it had caused over several decades. Old DuPont publicly claimed that the PFAS liabilities associated with the Performance Chemicals business that Old DuPont had transferred to Chemours rested solely with Chemours, and not with Old DuPont.

228.    Of course, Old DuPont could not contractually discharge all of its historical liabilities through the Chemours Spinoff, and Old DuPont remained liable for the liabilities it had caused, and that Chemours had assumed.

229.    Old DuPont knew that it could not escape liability and would still face exposure for PFAS liabilities, including for potentially massive punitive damages. So Old DuPont moved to the next phase of its fraudulent scheme.

230.    On December 11, 2015, less than six months following the Chemours Spinoff, Old DuPont and Old Dow announced that their respective boards had approved an agreement "under which the companies [would] combine in an all-stock merger of equals" and that the combined company would be named DowDuPont, Inc. ("Dow-DuPont Merger"). The companies disclosed that they intended to subsequently separate the combined companies' businesses into three publicly-traded companies through further spinoffs, each of which would occur 18 to 24 months following the closing of the merger.

231.    To effectuate the transaction, Old DuPont and Old Dow entered into an Agreement and Plan of Merger (the "Dow-DuPont Merger Agreement") that provided for (i) the

formation of a new holding company – Diamond-Orion HoldCo, Inc., later named DowDuPont, and then renamed DuPont de Nemours, Inc., (*i.e.*, New DuPont) and (ii) the creation of two new merger subsidiaries into which Old Dow and Old DuPont each would merge.

232.    Upon the closing of the DowDuPont Merger, Old Dow merged into one merger subsidiary, and Old DuPont merged into the other merger subsidiary. Thus, as a result of the merger, and in accordance with the DowDuPont Merger Agreement, Old Dow and Old DuPont each became wholly-owned subsidiaries of DowDuPont.

233.    Although Old DuPont and Old Dow referred to the transaction as a "merger of equals," the two companies did not actually merge at all, because doing so would have infected Old Dow with all of Old DuPont's historical PFAS liabilities. Rather, Old DuPont and Old Dow became affiliated sister companies that were each owned by the newly formed DowDuPont (*i.e.*, New DuPont).

234.    The below image reflects the corporate organization following the "merger":



**STEP 3: THE SHUFFLING, REORGANIZATION, AND TRANSFER OF VALUABLE ASSETS AWAY FROM OLD DUPONT AND SEPARATION OF CORTEVA AND NEW DOW**

235.    Following the Dow-DuPont Merger, DowDuPont (*i.e.*, New DuPont) underwent a significant internal reorganization, and engaged in numerous business segment and product line "realignments" and "divestitures." The net effect of these transactions has been the transfer, either directly or indirectly, of a substantial portion of Old DuPont's assets out of the company.

236.    While, again, the details of these transactions remain hidden from Plaintiff and other creditors, it is apparent that the transactions were intended to frustrate and hinder creditors with claims against Old DuPont, including with respect to its substantial PFAS liabilities. The significant internal reorganization instituted by DowDuPont (*i.e.*, New DuPont) was in preparation for the conglomerate being split into three, separate, publicly-traded companies.

237.    Old DuPont's assets, including its remaining business segments and product lines, were transferred either directly or indirectly to DowDuPont (*i.e.*, New DuPont), which reshuffled the assets and combined them with the assets of Old Dow, and then reorganized the combined assets into three distinct divisions: (i) the "Agriculture Business"; (ii) the "Specialty Products Business"; and (iii) the "Material Sciences Business."

238.    While the precise composition of these divisions, including many details of the specific transactions, the transfer of business segments, and the divestiture of product lines during this time, are not publicly available, it is apparent that Old DuPont transferred a substantial portion of its valuable assets to DowDuPont (*i.e.*, New DuPont), for far less than the assets were worth.

239.    Once the assets of Old DuPont and Old Dow were combined and reorganized, DowDuPont (*i.e.*, New DuPont) incorporated two new companies to hold two of the three newly formed business lines: (i) Corteva, which became the parent holding company of Old DuPont, which in turn holds the Agriculture Business; and (ii) New Dow, which became the parent

holding company of Old Dow, and which holds the Materials Science Business. DowDuPont
(*i.e.*, New DuPont) retained the Specialty Products Business, and prepared to spin off Corteva
and New Dow into separate, publicly traded companies.

240.    The below graph depicts the structure of DowDuPont after the internal
reorganization and realignment:



241.    The mechanics of the separations are governed by the April 1, 2019 Separation
and Distribution Agreement among Corteva, New Dow, and DowDuPont (*i.e.*, New DuPont)
(the "DowDuPont Separation Agreement").

242.    The Dow DuPont Separation Agreement generally allocates the assets primarily
related to the respective business divisions to Corteva (Agriculture Business), New Dow
(Materials Science Business) and New DuPont (Specialty Products Business), respectively. New
DuPont also retained several "non-core" business segments and product lines that once belonged
to Old DuPont.

243.    Similarly, Corteva, New Dow, and New DuPont each retained the liabilities

primarily related to the business divisions that they retained, *i.e.*, (i) Corteva retained and assumed the liabilities related to the Agriculture Business; (ii) New DuPont retained and assumed the liabilities related to the Specialty Products Business; and (iii) New Dow retained and assumed the liabilities related to the Materials Science Business.

244.    Corteva and New DuPont also assumed direct financial liability of Old DuPont that was not related to the Agriculture, Material Science or Specialty Products Businesses, including, upon information and belief, the PFAS liabilities. These assumed PFAS liabilities are allocated on a pro rata basis between Corteva and New DuPont pursuant to the DowDuPont Separation Agreement, such that, after both companies have satisfied certain conditions, future liabilities are allocated 71% to New DuPont and 29% to Corteva.

245.    This "allocation" applies to Old DuPont's legacy liabilities for PFAS contamination and its former Performance Chemicals business, including Plaintiff's claims in this case.

246.    While New DuPont and Corteva have buried the details in non-public schedules, upon information and belief, New DuPont and Corteva each assumed these liabilities under the DowDuPont Separation Agreement, along with other liabilities related to Old DuPont's discontinued and divested businesses. Plaintiff can therefore bring claims against New DuPont and Corteva directly for Old DuPont's contamination of the groundwater and surface water within Plaintiff's service area.

247.    The separation of New Dow was completed on or about April 1, 2019, when DowDuPont (*i.e.*, New DuPont) distributed all of New Dow's common stock to DowDuPont stockholders as a pro rata dividend. New Dow now trades on the New York Stock Exchange ("NYSE") under Old Dow's stock ticker "DOW."

248.    On or about May 2, 2019, DowDuPont (*i.e.*, New DuPont) consolidated the Agricultural Business line into Old DuPont, and then, on or about May 31, 2019, it "contributed" Old DuPont to Corteva. The following day, on June 1, 2019, DowDuPont (i.e., New DuPont) spun off Corteva as an independent public company.

249.    Corteva now holds 100% of the outstanding common stock of Old DuPont. Corteva now also trades on the NYSE under the stock ticker "CTVA."

250.    The separation of Corteva was completed on or about June 1, 2019, when DowDuPont distributed all of Corteva's common stock to DowDuPont (*i.e.*, New DuPont) stockholders as a pro rata dividend.

251.    The corporate structures of New Dow and Old Dow, and Corteva and Old DuPont, respectively, following the separations are depicted below:





252.    Also, on or about June 1, 2019, DowDuPont changed its registered name to Du Pont de Nemours Inc. (*i.e.*, New DuPont).

### THE EFFECT OF THE YEARS-LONG SCHEME TO DEFRAUD PLAINTIFF AND OTHER CREDITORS AND AVOID FINANCIAL RESPONSIBILITY FOR LEGACY LIABILITIES

253.    The net result of these transactions was to strip away valuable tangible assets from Old DuPont and transfer those assets to New DuPont and Corteva for far less than the assets are worth.

254.    Old DuPont estimated that the Dow-DuPont Merger created "goodwill" worth billions of dollars. When the Corteva separation was complete, a portion of this "goodwill" was assigned to Old DuPont in order to prop up its balance sheet. But, in reality, Old DuPont was left with substantially fewer tangible assets than it had prior to the restructuring.

255.    In addition, Old DuPont owes a debt to Corteva of approximately $4 billion.

Recent SEC filings demonstrate the substantial deterioration of Old DuPont's finances and the drastic change in its financial condition before and after the above transactions.

256.    For example, for the fiscal year ended 2014, prior to the Chemours Spinoff, Old DuPont reported $3.6 billion in net income and $3.7 billion in cash provided by operating activities. For the fiscal year ended 2019, just months after the Corteva separation, however, Old DuPont reported a net loss of negative $1 billion and only $996 million in cash provided by operating activities. That is a decrease of 128% in net income and a decrease of 73% in annual operating cash flow.

257.    Additionally, Old DuPont reported a significant decrease in Income From Continuing Operations Before Income Taxes ("EBT"). Old DuPont reported $4.9 billion in EBT for the period ending December 31, 2014. For the period ending December 31, 2019, Old DuPont reported EBT of negative $422 million.

258.    The value of Old DuPont's tangible assets further underscores Old DuPont's precarious financial situation. For the fiscal year ended 2014, prior to the Chemours Spinoff, Old DuPont owned nearly $41 billion in tangible assets. For the fiscal year ended 2019, Old DuPont owned just under $21 billion in tangible assets.

259.    That means in the five-year period over which the restructuring occurred, when Old DuPont knew that it faced billions of dollars in PFAS liabilities, Old DuPont transferred or divested approximately half of its tangible assets—totaling $20 billion.

260.    As of September 2019, just after the Corteva spinoff, Old DuPont reported $43.251 billion in assets. But almost $21.835 billion of these assets were comprised of intangible assets, including "goodwill" from its successive restructuring activities.

261.    At the same time, Old DuPont reported liabilities totaling $22.060 billion. Thus,

when the Corteva spinoff was complete, Old DuPont's tangible net worth (excluding its intangible assets) was negative $644 million.

262.    Old DuPont's financial condition has continued to deteriorate. By end of fiscal year 2019, Old DuPont reported $42.397 billion in total assets, half of which (or $21.653 billion) are intangible assets. Old DuPont's reported liabilities for the same period totaled $21.869 billion.

263.    Old DuPont's tangible net worth between September 30, 2019 and December 31, 2019 declined even further, whereby Old DuPont ended fiscal year 2019 with tangible net worth of negative $1.125 billion.

264.    In addition, Plaintiff cannot take comfort in the "allocation" of liabilities to New DuPont and Corteva. Neither of those Defendants has publicly conceded that they assumed Old DuPont's historical PFAS liabilities. And it is far from clear that either entity will be able to satisfy any judgment in this case.

265.    Indeed, New DuPont—to which 71% of PFAS liabilities are "allocated" under the DowDuPont Separation Agreement once certain conditions are satisfied—is in the process of divesting numerous business segments and product lines, including tangible assets that it received from Old DuPont, and for which Old DuPont has received less than reasonably equivalent value.

266.    New DuPont has received or will receive significant proceeds on the sales of Old DuPont's former business segments and product lines.

267.    In September 2019, New DuPont sold the Sustainable Solutions business for $28 million to Gyrus Capital.

268.    On or about December 15, 2019, New DuPont agreed to sell the Nutrition and

Biosciences business to International Flavors & Fragrances for $26.2 billion.

269.    In March 2020, New DuPont completed the sale of Compound Semiconductor Solutions for $450 million to SK Siltron.

270.    In addition, New DuPont has issued Notices of Intent to Sell relating to six non-core segments (estimated by market analysts at approximately $4.5 billion), as well as the Transportation and Industrial Chemicals business, which had reported net sales revenue in 2019 of $4.95 billion and estimated annual operating earnings before interest, taxes, depreciation, and amortization of $1.3 billion.

271.    Old DuPont's parent holding company, Corteva—to which 29% of PFAS liabilities are "allocated" under the DowDuPont Separation Agreement once certain conditions are satisfied—holds as its primary tangible asset the intercompany debt owed to it by its wholly-owned subsidiary, Old DuPont. But Old DuPont does not have sufficient tangible assets to satisfy this debt obligation.

## FIRE-PRODUCT DEFENDANTS' LIABILITY

272.    The Fire-Product Defendants' manufacture, distribution, and sale of AFFF has caused, and continues to cause, widespread injury to groundwater and surface water.

273.    The Fire-Product Defendants knew or should have known that AFFF would cause injury to groundwater and surface water, fish, wildlife, marine resources, and other natural resources of the County, as well as its citizens.

274.    The Fire-Product Defendants knew or should have known that PFOA and PFOS in AFFF would be released into the environment.

275.    The Fire-Product Defendants knew or should have known that such releases from the use or disposal of AFFF would injure the groundwater and surface water resources.

276.    The Fire-Product Defendants knew or should have known that such releases from the use or disposal of AFFF would make groundwater and surface water unfit for drinking.

277.    The Fire-Product Defendants knew or should have known that PFOA and PFOS would be released into the environment from the use or disposal of AFFF.

278.    The Fire-Product Defendants' products were defective in design in a manner that was unreasonably dangerous to users or consumers including Plaintiff.

279.    The defective products were sold by the Fire-Product Defendants who are in the business of selling such products.

280.    The use of the products by Plaintiff and others was reasonably foreseeable by the Fire-Product Defendants.

281.    The losses, damages, and harms suffered by Plaintiff described herein would not have occurred but for the conduct of the Fire-Product Defendants, and the Fire-Product Defendants' conduct was a substantial factor in causing the losses, damages and harms.

282.    The Fire-Product Defendants failed to warn of the dangers of their products.

283.    To enhance their profits, the Fire-Product Defendants knowingly and deliberately failed to remedy the known defects in their AFFF-related products and failed to warn the public, including Plaintiff, that the subject products were inherently dangerous, and that there was an extreme risk of injury and harm occasioned by the inherently dangerous nature of the products and defects inherent in the products. Fire-Product Defendants and their individual agents, officers, and directors intentionally proceeded with the manufacturing, sale, distribution and marketing of the subject products knowing that the public, including Plaintiff, would be exposed to harm and danger in order to advance Fire-Product Defendants' own pecuniary interest.

284.    Based on information and belief, Plaintiff alleges that, at all relevant times alleged

herein, the Fire-Product Defendants' conduct was despicable, wanton, reckless, malicious, and oppressive, and was carried on by the Fire-Product Defendants with willful and conscious disregard for safety, entitling Plaintiff to enhanced compensatory damages.

## LIABILITY OF FIRE-PRODUCT DEFENDANTS

### FIRST CAUSE OF ACTION
### Strict Product Liability Based on Design Defect
### (By Plaintiff against AFFF Defendants)

285.    Plaintiff repeats and restates the allegations set forth in the previous paragraphs as if fully restated in this cause of action.

286.    At all times relevant herein, AFFF Defendants were engaged in the business of researching, designing, manufacturing, testing, marketing, distributing, and/or selling AFFF containing PFAS. By doing so, AFFF Defendants impliedly warranted that AFFF was merchantable, safe, and fit for ordinary purposes for which it was used, including for fire-fighting training exercises.

287.    It was reasonably foreseeable that the AFFF containing PFAS that AFFF Defendants manufactured and/or distributed and sold would be used on in proximity to wells within Plaintiff's service area.

288.    It was reasonably foreseeable that the AFFF containing PFAS that AFFF Defendants manufactured and/or distributed and sold would contaminate wells within Plaintiff's service area and the groundwater and cause damages.

289.    AFFF Defendants' AFFF products were manufactured for placement into trade or commerce.

290.    AFFF Defendants marketed and sold AFFF for use in controlling and extinguishing aviation, marine, fuel, and other shallow spill fires.

291.    As manufacturers, AFFF Defendants owed a duty to all persons whom its products might foreseeably harm, including Plaintiff, not to market any product which is unreasonably dangerous in design for its reasonably anticipated use.

292.    By manufacturing and selling AFFF containing PFAS, AFFF Defendants warranted that such AFFF was merchantable, safe, and fit for ordinary purposes.

293.    On information and belief, the AFFF as manufactured and/or sold by AFFF Defendants reached Plaintiff's service area without substantial change in its condition and was used by local fire training academies, local fire departments, and airports in a reasonably foreseeable and intended manner.

294.    The AFFF, as manufactured and/or sold by the AFFF Defendants, was "defective" and "unreasonably dangerous" when it left the AFFF Defendants' control, entered the stream of commerce, and was received by two local firefighting training academies and a fire department because it was dangerous to an extent beyond that which would be contemplated by the ordinary user of AFFF.

295.    The AFFF manufactured and/or sold by AFFF Defendants was defective in design because, even when used as intended and directed by AFFF Defendants, it can result in the contamination of soil and groundwater with PFAS, creating a significant threat to groundwater and drinking water supplies.

296.    The AFFF manufactured and/or sold by AFFF Defendants did not meet a consumer's reasonable expectation as to its safety because of its propensity to contaminate soil and groundwater when used as intended.

297.    AFFF Defendants failed to develop and make available alternative AFFF products that were designed in a safe or safer manner, even though such products were technologically

feasible, practical, commercially viable, and marketable at the time AFFF Defendants introduced AFFF containing PFAS into the stream of commerce.

298.    AFFF Defendants failed to develop and make available alternative AFFF products that were designed in a safe or safer manner, even though such products were technologically feasible, practical, commercially viable, and marketable at the time AFFF Defendants introduced AFFF containing PFAS into the stream of commerce.

299.    The specific risk of harm in the form of soil, groundwater, and drinking water contamination from AFFF containing PFAS that AFFF Defendants manufactured and/or sold was reasonably foreseeable or discoverable by AFFF Defendants.

300.    PFAS are dangerous to an extent beyond that which would be contemplated by the ordinary consumer of AFFF.

301.    The design, formulation, manufacture and/or distribution and sale of AFFF containing PFAS that were known to be toxic and extremely mobile and persistent in the environment, was unreasonably dangerous.

302.    AFFF Defendants' introduction of AFFF containing PFAS into the stream of commerce was a proximate cause of Plaintiff's damage requiring investigation, clean-up, abatement, remediation, and monitoring costs and other damages in an amount to be determined at trial. AFFF Defendants are strictly, jointly, and severally liable for all such damages.

**SECOND CAUSE OF ACTION**
**Strict Products Liability Based on Failure to Warn**
**(By Plaintiff against AFFF Defendants)**

303.    Plaintiff repeats and restates the allegations set forth in the previous paragraphs as if fully set forth herein.

304.    The use of AFFF in proximity to wells within Plaintiff's service area for training

of fire personnel in the use of AFFF was a reasonably foreseeable use. AFFF Defendants knew or should have known that AFFF used in this manner can contaminate soil and groundwater with PFAS, creating a significant threat to human health and the environment.

305.    It was foreseeable that PFAS from the AFFF that AFFF Defendants manufactured and sold would enter the and groundwater, resulting in the contamination of drinking water supplies that rely upon the groundwater for the source of drinking water, including within Plaintiff's service area.

306.    AFFF Defendants had a duty to warn the users of AFFF of these hazards.

307.    AFFF Defendants, however, failed to provide adequate warnings of these hazards.

308.    AFFF Defendants' failure to issue the proper warnings relating to AFFF containing PFAS affected the market's acceptance of AFFF containing PFAS.

309.    AFFF Defendants' failure to issue the proper warnings relating to AFFF containing PFAS prevented the users of the product from treating it differently with respect to its use and environmental cleanup.

310.    AFFF Defendants' failure to issue the proper warnings related to AFFF containing PFAS prevented the users of the product from seeking alternative products, including but not limited to, using alternative products for purposes of training in the use of AFFF.

311.    AFFF Defendants' action in placing AFFF containing PFAS into the stream of commerce was a direct and proximate cause of Plaintiff's injury.

312.    As a direct and proximate result of the Defendants' failure to warn, Plaintiff has suffered damage, requiring investigation, clean-up, abatement, remediation, and monitoring costs and suffered other damages in an amount to be determined at trial. The AFFF Defendants are strictly, jointly, and severally liable for all such damages.

## THIRD CAUSE OF ACTION
### Negligence
### (By Plaintiff against AFFF Defendants)

313.    Plaintiff repeats and restates the allegations set forth in the previous paragraphs as if fully set forth herein.

314.    AFFF Defendants had a duty to Plaintiff to manufacture and/or market, distribute, and sell their AFFF in a manner that avoided contamination of the environment and drinking water supplies and avoided harm to those who foreseeably would be injured by the PFAS contained in Defendants' AFFF products.

315.    The use of AFFF Defendants' AFFF products at local fire training academies, fire departments, and airports was a reasonably foreseeable use. AFFF Defendants knew or should have known that its AFFF used in this manner would contaminate soil and groundwater with PFAS, creating a significant threat to human health and the environment. The AFFF Defendants had a duty to prevent the release of PFAS, in the foreseeable uses of AFFF.

316.    AFFF Defendants breached their duties when they negligently manufactured a dangerous product (AFFF), negligently marketed, distributed, and sold that product, and/or negligently failed to give adequate warning that such products should not have been used in a manner such as to result in the contamination of soil and groundwater.

317.    As a direct and proximate result of AFFF Defendants' breaches of their duties, AFFF Defendants caused Plaintiff to suffer actual losses. Specifically, Plaintiff suffered damage requiring investigation, clean-up, abatement, remediation, and monitoring costs and suffered other damages in an amount to be determined at trial. AFFF Defendants are strictly, jointly, and severally liable for all such damages.

## FOURTH CAUSE OF ACTION
### Continuing Trespass
### (By Plaintiff against AFFF Defendants)

318.    Plaintiff repeats and restates the allegations set forth in all previous paragraphs of this Complaint as if fully set forth herein.

319.    Plaintiff has a statutory right and duty to protect groundwater supplies within the basin from contamination. Water Code § 60224.

320.    The AFFF Defendants were engaged in the business of researching, designing, formulating, handling, training, disposing, manufacturing, labeling, using, testing, distributing, promoting, marketing, selling, and/or otherwise being responsible for AFFF and knew or should have known that the subsequent and foreseeable use and disposal of AFFF would contaminate the groundwater and drinking water supply wells. Thus, the AFFF Defendants intentionally, recklessly, negligently or as the result of engaging in an extra-hazardous activity, caused noxious and hazardous contaminants and pollutants to enter the surface water, groundwater, replenishment water, and drinking water supply.

321.    AFFF and PFAS compounds manufactured and/or supplied by the AFFF Defendants continue to be located in the water resources within Plaintiff's service area, including the groundwater that supplies drinking water within Plaintiff's service area.

322.    Plaintiff did not, and do not, consent to the trespass alleged herein. The AFFF Defendants knew or reasonably should have known that Plaintiff would not consent to this trespass.

323.    The contamination of surface water, groundwater, and wells within Plaintiff's service area alleged herein has not yet ceased. PFAS continue to migrate into and enter groundwater within Plaintiff's service area.

324.    As a direct and proximate result of the AFFF Defendants' acts and omissions as alleged herein, the surface water, groundwater, replenishment water, and drinking water supply have been, and continue to be, contaminated with PFAS, causing Plaintiff significant injury and damage.

325.    As a direct and proximate result of these AFFF Defendants' acts and omissions as alleged herein, Plaintiff has incurred, are incurring, and will continue to incur, investigation, treatment, remediation, monitoring, and disposal costs and expenses related to the contamination of groundwater within Plaintiff's service area in an amount to be proved at trial.

326.    As a further direct and proximate result of the AFFF Defendants' acts and omissions as alleged herein, Plaintiff seeks any benefits or profits obtained by AFFF Defendants related to the trespass under *Starrh & Starrh Cotton Growers v. Aera Energy LLC* (2007) 153 Cal. App. 4th 583, and all other damages and remedies allowable under California Civil Code § 3334 and California law. The AFFF Defendants knew and/or should have known that it was substantially certain that their alleged acts and omissions described in this Complaint would cause injury and damage, including contamination of drinking water supplies with PFAS. The AFFF Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of AFFF and maximize profits, in conscious disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon health, property, and the environment, including groundwater within Plaintiff's service area. Therefore, Plaintiff also requests an award of exemplary damages in an amount that is sufficient to punish these AFFF Defendants and that fairly reflects the aggravating circumstances alleged herein.

## FIFTH CAUSE OF ACTION
## Public and Private Nuisance
## (By Plaintiff against AFFF Defendants)

327.    Plaintiff repeats and restates the allegations set forth in the previous paragraphs as if fully set forth herein.

328.    Plaintiff is the owner of land, easements, and/or water rights which permit it to extract and replenish groundwater for use in its service area.

329.    The actions of the AFFF Defendants as alleged herein, have resulted in the continuing contamination of wells within Plaintiff's service area and the groundwater that supplies them by PFAS, and such contamination is a public nuisance defined in California Civil Code section 3479, California Civil Code section 3480, California Health and Safety Code section 5410, and California Water Code section 13050, and is reasonably abatable and varies over time. Each AFFF Defendant has caused, maintained, assisted and/or participated in such nuisance, and is a substantial contributor to such nuisance.

330.    The actions of the AFFF Defendants constitute a nuisance in that the contamination of groundwater and drinking water is injurious to public health, is indecent or offensive to the senses and is an obstruction to the Plaintiff's free use of its water rights. The contamination of the Plaintiff's service area significantly affects, at the same time, a considerable number of people in an entire community.

331.    Each AFFF Defendant has caused, maintained, assisted and/or participated in such nuisance, and is a substantial contributor to such nuisance.

332.    By its design, the AFFF Defendants' AFFF were known by AFFF Defendants to contain compounds that would likely be discharged to the environment in a manner that would create a nuisance and further failed to properly instruct intermediaries and end-users to properly

use and dispose of such contaminants in such a manner as to avoid creating or contributing to a nuisance.

333.    The AFFF Defendants knew, or should have known, of the harmful effects and adverse impacts that exposure to PFAS would have on the environment and human health.

334.    The AFFF Defendants caused or contributed to the creation of the nuisance at issue by directing and instructing intermediaries and end users of its products to dispose of products and materials containing PFAS in a manner that the AFFF Defendants knew or should have known would result in the contamination of soil and groundwater and ultimately impact drinking water.

335.    Plaintiff did not and does not consent to the public nuisance alleged herein. AFFF Defendants knew or reasonably should have known that Plaintiff would not consent to this public nuisance.

336.    As a direct and proximate result of the AFFF Defendants' acts and omissions as alleged herein, the contaminated wells within Plaintiff's service area and the groundwaters that supply them have been, and continue to be, contaminated with PFAS, causing Plaintiff significant injury and damage.

337.    As a direct and proximate result of these AFFF Defendants' acts and omissions as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur, investigation, treatment, remediation, and monitoring costs and expenses related to the PFAS in an amount to be proved at trial.

338.    Furthermore, as a direct and proximate result of the AFFF Defendants' acts and omissions as alleged herein, the contamination of groundwater and drinking water supplies constitutes an ongoing public nuisance.

339.    The AFFF Defendants are jointly and severally responsible to take such action as is necessary to abate the public nuisance and to take such action as is necessary to ensure that the PFOA and PFOS that contaminate the aquifer and other water resources supplying water Plaintiff's service area do not present a risk to the public.

340.    Plaintiff has been damaged because the AFFF Defendants' acts and omissions, have unreasonably interfered with, and continue to interfere with, Plaintiff's free use of its water rights and continues to suffer significant damages and injuries, including but not limited to, incurring costs related to the investigation, sampling, treatment system design, acquisition, installation, operations and maintenance, and other costs and damages related to the detection and remediation of the PFAS contamination of its water supply systems.

341.    The AFFF Defendants knew and/or should have known that it was substantially certain that their alleged acts and omissions described in this Complaint would cause injury and damage, including contamination of drinking water supplies with PFAS.

342.    The AFFF Defendants knew with substantial certainty at the time of their manufacture and sale of fluorosurfactants, fluorochemicals, and AFFF containing PFAS that their products would result in contamination of drinking water resources within Plaintiff's service area.

343.    The AFFF Defendants' acts and omissions were substantially certain to and did result in an unreasonable interference with wells within Plaintiff's service area.

344.    As a direct and proximate result of the AFFF Defendants' acts and omissions, the AFFF Defendants caused Plaintiff to suffer actual losses.

345.    The AFFF Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to

promote sales of AFFF, fluorosurfactants, and fluorochemicals to maximize profits, in conscious disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon health, property, and the environment.

346.    Specifically, Plaintiff suffered damage requiring investigation, clean-up, abatement, remediation, and monitoring costs and suffered other damages in an amount to be determined at trial.

347.    Additionally, Plaintiff also requests an award of exemplary damages in an amount that is sufficient to punish these AFFF Defendants and that fairly reflects the aggravating circumstances alleged herein.

**SIXTH CAUSE OF ACTION**
**Liability of Surfactant/Intermediary Defendants for Counts 1-5**
**(By Plaintiff against Surfactant/Intermediary Defendants)**

348.    Plaintiff repeats and restates the allegations set forth in all the previous paragraphs of this Complaint as if fully set forth herein.

349.    Plaintiff asserts the same allegations and causes of action described above in counts one through five against the Surfactant/Intermediary Defendants to the extent that their manufacture and sale of fluorosurfactants and/or fluorochemicals or the failure to disclose the risks and harms associated with the use of their fluorosurfactants and/or fluorochemicals in the manufacture of AFFF resulted in damages to Plaintiff as described herein.

350.    On information and belief, Corteva and New DuPont assumed Old DuPont's liability for the damages described above.

**LIABILITY OF FLUOROCHEMICAL DEFENDANTS**

**SEVENTH CAUSE OF ACTION**
**Strict Products Liability Based on Defective Design**
**(By Plaintiff against Fluorochemical Defendants)**

351.    Plaintiff repeats and restates the allegations set forth in all the previous paragraphs of this Complaint as if fully set forth herein.

352.    As a result of the Old DuPont, and Chemours' manufacture, sale, distribution, marketing, instructions, lack of warning, and failure to properly instruct users regarding the nature of their Fluorochemical Products, PFAS have caused widespread contamination, including contamination of wells within Plaintiff's service area, which liability New DuPont and Corteva have contractually assumed. (Collectively, "Fluorochemical Defendants.")

353.    Plaintiff has incurred, is incurring, and/or will continue to incur investigation, sampling, remediation, treatment system design, acquisition, installation, operations and maintenance, and other costs and damages related to the contamination of the surface water, groundwater, replenishment water, drinking water supply, disposal, and the contaminated wells within Plaintiff's service area.

354.    Fluorochemical Defendants' Fluorochemical Products were defective in design and formulation when they left Fluorochemical Defendants' hands. When used in a foreseeable manner, these Fluorochemical Products resulted in the spillage, leaching, discharge, disposal, and/or release of PFAS resulting in contamination of surface water and groundwater in the vicinity of contaminated wells within Plaintiff's service area. At all times relevant to this action, Fluorochemical Defendants' PFAS containing Fluorochemical Products were defective and inherently dangerous to an extent beyond which would be contemplated by the ordinary consumer, and/or benefit of the presence of PFAS, if any, did not outweigh the risk of harm to the public health and welfare and the environment posed by the presence of PFAS.

355.    Fluorochemical Defendants are strictly, jointly, and severally liable for the damages discussed above.

356.    As a direct and proximate result of the defects previously described, the surface water and groundwater including groundwater that serves as the source of water to the contaminated wells within Plaintiff's service area and surface water that serves as the source of replenishment water for Plaintiff's service area, is and will continue to be, contaminated with PFAS, causing damage to such groundwaters and causing Plaintiff significant injury and property damage. Restoration, repair, and/or remediation of the property damage alleged herein has required Plaintiff, and will continue to require Plaintiff, to incur substantial costs and expenses in an amount to be proved at trial.

357.    Fluorochemical Defendants when researching, designing, formulating, handling, disposing, manufacturing, labeling, using, testing, distributing, promoting, marketing, selling, and/or otherwise being responsible for their Fluorochemical Products containing PFAS, anticipated and should have accounted for the foreseeable risks posed by their Fluorochemical Products.

358.    Fluorochemical Defendants knew and/or should have known that it was substantially certain that their alleged acts and omissions described in this Complaint would cause injury and damage. They each committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of PFAS and/or products that contain PFAS and maximize profits, in conscious disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon health, property, and the environment, including the surface water, groundwater, replenishment water, drinking water supply, and the contaminated wells within Plaintiff's service area. Therefore, Plaintiff also request an award of exemplary damages in an amount that is sufficient to punish Fluorochemical Defendants and that fairly reflects the aggravating

circumstances alleged herein.

359.     On information and belief, New DuPont and Corteva have contractually assumed Old DuPont's liabilities associated with the allegations set forth in this claim.

## EIGHTH CAUSE OF ACTION
### Strict Products Liability Based on Failure to Warn
### (By Plaintiff against Fluorochemical Defendants)

360.     Plaintiff repeats and restates the allegations set forth in all the previous paragraphs of this Complaint as if fully set forth herein.

361.     As a result of the Fluorochemical Defendants' Fluorochemical Products, Plaintiff has incurred, is incurring, and/or will continue to incur investigation, sampling, remediation, treatment system design, acquisition, installation, operations and maintenance, and other costs and damages related to the contamination of wells within Plaintiff's service area.

362.     Products containing PFAS manufactured and/or supplied by the Fluorochemical Defendants are defective and unreasonably dangerous products. Fluorochemical Defendants' Fluorochemical Products were used in a manner in which they were foreseeably intended to be used. Because of the gravity of the risks and the severity of the harm posed by the Fluorochemical Products, and because of the unique and sophisticated dangers inherent in PFAS and/or products containing PFAS, Fluorochemical Defendants could and should have taken additional steps to ensure that adequate or effective warnings were communicated.

363.     On information and belief, Fluorochemical Defendants represented, asserted, claimed, and warranted that their Fluorochemical Products did not require any different or special handling or precautions to prevent risk and damage to human health and the environment.

364.     Fluorochemical Defendants are strictly, jointly, and severally liable for the damages discussed above.

365. Fluorochemical Defendants, when researching, designing, formulating, handling, disposing, manufacturing, labeling, using, testing, distributing, promoting, marketing, selling, and/or otherwise being responsible for their Fluorochemical Products containing PFAS, anticipated and should have accounted for the foreseeable risks posed by their Fluorochemical Products.

366. Fluorochemical Defendants knew and/or should have known that it was substantially certain that their alleged acts and omissions described in this Complaint would cause injury and damage. Fluorochemical Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of PFAS and/or products that contain PFAS and maximize profits, in conscious disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon health, property and the environment, including the surface water, groundwater, replenishment water, drinking water supply, and the wells within Plaintiff's service area. Therefore, Plaintiff also request an award of exemplary damages in an amount that is sufficient to punish Fluorochemical Defendants and that fairly reflects the aggravating circumstances alleged herein.

367. On information and belief, New DuPont and Corteva contractually assumed Old DuPont's liabilities associated with this claim.

## NINTH CAUSE OF ACTION
### Negligence
### (By Plaintiff against Fluorochemical Defendants)

368. Plaintiff repeats and restates the allegations set forth in all the previous paragraphs of this Complaint as if fully set forth herein.

369. The Fluorochemical Defendants had a duty to the Plaintiff to exercise due care in

the researching, designing, formulating, handling, disposing, manufacturing, labeling, using, testing, distributing, promoting, marketing, selling and instructions for the use and disposal of PFAS and products containing PFAS.

370.    The Fluorochemical Defendants breached their duty of care in that they negligently, carelessly, and/or recklessly researched, designed, formulated, handled, disposed, manufactured, labeled, used, tested, distributed, promoted, marketed, sold and/or instructed for use and disposal of PFAS and products containing PFAS and directly and proximately caused PFAS contamination of the wells within Plaintiff's service area in an amount to be proved at trial.

371.    The Fluorochemical Defendants breached their duty of care in that they negligently, carelessly, and/or recklessly researched, designed, formulated, handled, disposed, manufactured, labeled, used, tested, distributed, promoted, marketed, sold and/or instructed for use and disposal of PFAS and products containing PFAS when they knew, or should have known, that PFAS would: (i) be released into the environment from industrial, commercial and consumer uses and sources; (ii) be released and contaminate the wells within Plaintiff's service area.

372.    Despite their knowledge that contamination with PFAS was the inevitable consequence of their conduct as alleged herein, the Fluorochemical Defendants failed to provide reasonable warnings or special instructions, failed to take other reasonable precautionary measures to prevent or mitigate such contamination, and/or affirmatively misrepresented the hazards of PFAS in their product information and/or instructions for use.

373.    As a direct and proximate result of the Fluorochemical Defendants' acts and omissions as alleged herein, the Plaintiff has suffered monetary losses and damages in amounts

to be proven at trial. The Fluorochemical Defendants knew and/or should have known that it was substantially certain that their alleged acts and omissions described in this Complaint would cause injury and damage, including contamination of the wells within Plaintiff's service area with PFAS.

374.    The Fluorochemical Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of PFAS and/or products that contain PFAS and maximize profits, in conscious disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon health, property and the environment, including contaminated wells within Plaintiff's service area. Therefore, Plaintiff also requests an award of exemplary damages in an amount that is sufficient to punish the Fluorochemical Defendants and that fairly reflects the aggravating circumstances alleged herein.

375.    On information and belief, New DuPont and Corteva contractually assumed Old DuPont's liability associated with this claim.

### TENTH CAUSE OF ACTION
### Continuing Trespass
### (By Plaintiff against Fluorochemical Defendants)

376.    Plaintiff repeats and restates the allegations set forth in all previous paragraphs of this Complaint as if fully set forth herein.

377.    Plaintiff holds possessory property rights and interests that have been contaminated with PFAS.

378.    Plaintiff owns, possesses, and actively exercises rights to extract and replenish groundwater drawn from within Plaintiff's service area.

379.    The Fluorochemical Defendants were engaged in the business of researching,

designing, formulating, handling, disposing, manufacturing, labeling, using, testing, distributing, promoting, marketing, selling, and/or otherwise being responsible for PFAS and/or products that contain PFAS and knew or should have known that the subsequent and foreseeable use and disposal of those compounds and products would contaminate the groundwater and drinking water supply wells. Thus, the Fluorochemical Defendants intentionally, recklessly, negligently or as the result of engaging in an extra-hazardous activity, caused noxious and hazardous contaminants and pollutants to enter the surface water, groundwater, replenishment water, and drinking water supply.

380.    PFAS manufactured and/or supplied by the Fluorochemical Defendants continue to be located on or in Plaintiff's property, and the surface water, groundwater, replenishment water, and drinking water supply that supply water within Plaintiff's service area.

381.    Plaintiff did not, and does not, consent to the trespass alleged herein. The Fluorochemical Defendants knew or reasonably should have known that Plaintiff would not consent to this trespass.

382.    The contamination of wells within Plaintiff's service area alleged herein has not yet ceased. PFAS continue to migrate into and enter groundwater and wells within Plaintiff's service area.

383.    As a direct and proximate result of the Fluorochemical Defendants' acts and omissions as alleged herein, the surface water, groundwater, replenishment water, and drinking water supply have been, and continue to be, contaminated with PFAS, causing Plaintiff significant injury and damage.

384.    As a direct and proximate result of these Fluorochemical Defendants' acts and omissions as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur,

investigation, treatment, remediation, monitoring, and disposal costs and expenses related to the contamination of groundwater and wells within Plaintiff's service area in an amount to be proved at trial.

385.    As a further direct and proximate result of the Fluorochemical Defendants' acts and omissions as alleged herein, Plaintiff seeks the reasonable costs of repair or restoration of all of Plaintiff's property to its original condition, costs associated with recovering the possession, any benefits or profits obtained by Fluorochemical Defendants related to the trespass under *Starrh & Starrh Cotton Growers v. Aera Energy LLC* (2007) 153 Cal. App. 4th 583, and all other damages and remedies allowable under California Civil Code § 3334 and California law.

386.    The Fluorochemical Defendants knew and/or should have known that it was substantially certain that their alleged acts and omissions described in this Complaint would cause injury and damage, including contamination of drinking water supplies with PFAS.

387.    The Fluorochemical Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of PFAS and/or products that contain PFAS and maximize profits, in conscious disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon health, property, and the environment, including groundwater and wells within Plaintiff's service area. Therefore, Plaintiff also requests an award of exemplary damages in an amount that is sufficient to punish these Fluorochemical Defendants and that fairly reflects the aggravating circumstances alleged herein.

388.    On information and belief, New DuPont and Corteva contractually assumed Old DuPont's liabilities associated with this claim.

### ELEVENTH CAUSE OF ACTION
**Private and Public Nuisance**
**(By Plaintiff against Fluorochemical Defendants)**

389.    Plaintiff repeats and restates the allegations set forth in all previous paragraphs of this Complaint as if fully set forth herein.

390.    Plaintiff holds possessory property rights and interests that have been contaminated with PFAS.

391.    The actions of the Fluorochemical Defendants as alleged herein, have resulted in the continuing contamination of wells within Plaintiff's service area with PFOA and PFOS, and such contamination is a public nuisance as defined in California Civil Code section 3479, California Civil Code section 3480, California Health and Safety Code section 5410, and California Water Code section 13050, and is reasonably abatable and varies over time. Each Fluorochemical Defendant has caused, maintained, assisted and/or participated in such nuisance, and is a substantial contributor to such nuisance.

392.    The actions of the Fluorochemical Defendants constitute a nuisance in that the contamination of groundwater and drinking water is injurious to public health, is indecent or offensive to the senses and is an obstruction to the Plaintiff's duties and obligations to its service area. The contamination of the wells within Plaintiff's service area significantly affects, at the same time, a considerable number of people in an entire community.

393.    By its design, the Fluorochemical Defendants' PFAS and products containing PFAS are known by Fluorochemical Defendants to contain compounds that will likely be discharged to the environment in a manner that will create a nuisance and further failed to properly instruct intermediaries and end-users to properly use and dispose of such contaminants in such a manner that not create or contribute to the creation of a nuisance.

394.     The Fluorochemical Defendants knew, or should have known, of the harmful effects and adverse impacts that exposure to PFAS would have on the environment and human health.

395.     The Fluorochemical Defendants' conduct was a substantial factor in causing the creation of the nuisance at issue by marketing and promoting the use of PFAS in a manner and directing and instructing intermediaries and end users of its products to dispose of products and materials containing PFAS improperly and in a manner that Fluorochemical Defendants knew or should have known would result in the contamination of the wells within Plaintiff's service area.

396.     The Fluorochemical Defendants' conduct was a substantial factor in causing the harm suffered by Plaintiff as a result of the contamination nuisance described herein. As a result of the Fluorochemical Defendants' acts and omissions as alleged herein, the wells within Plaintiff's service area have been, and continue to be, contaminated with PFAS, causing Plaintiff significant injury and damage. As a result of the Fluorochemical Defendants' acts and omissions as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur, investigation, treatment, remediation, monitoring, and disposal costs and expenses related to the PFAS contamination of the wells within Plaintiff's service area in an amount to be proved at trial.

397.     Furthermore, as a result of the Fluorochemical Defendants' acts and omissions as alleged herein, the contamination of the wells within Plaintiff's service area constitutes a continuing public nuisance because it is reasonably abatable and because the groundwater contamination at issue continues to migrate, move, and spread onto, into, across, and through Plaintiff's service area, and its impact has thus varied, and continues to vary, over time.

398.     The Fluorochemical Defendants have continued and will continue, unless restrained by this Court, to maintain the nuisance by failing to investigate, remove, and

remediate the environmental contamination they are responsible for. Unless the Fluorochemical Defendants are restrained by order of this Court from continuing their non-responsive course of conduct and failure to abate the contamination they have caused, it will be necessary for the Plaintiff to commence many successive actions against the Fluorochemical Defendants to secure compensation for damage sustained, thus requiring a multiplicity of suits.

399.    The Fluorochemical Defendants are jointly and severally responsible to take such action as is necessary to abate the public nuisance and to take such action as is necessary to ensure that the PFAS that contaminate the groundwater supplying water to the wells within Plaintiff's service area do not present a risk to the public.

400.    Plaintiff has been specially damaged because the Fluorochemical Defendants' acts and omissions have unreasonably interfered with, and continue to interfere with, Plaintiff's free use of its water system, and has suffered and continues to suffer significant damages and injuries, including but not limited to, incurring costs related to the investigation, sampling, treatment system design, acquisition, installation, operations and maintenance, and other costs and damages related to the detection and remediation of the PFAS contamination.

401.    Plaintiff did not and does not consent to the public nuisance alleged herein. The Fluorochemical Defendants knew or reasonably should have known that Plaintiff would not consent to this public nuisance.

402.    As a direct and proximate result of the nuisance, Plaintiff has been damaged within the three years preceding the filing of this lawsuit and is entitled to the compensatory damages alleged herein in an amount to be proven at trial, or to such other appropriate relief as it may elect at trial, including, but not limited to, equitable relief in the form of an order requiring the Fluorochemical Defendants to abate the nuisance.

403.    The Fluorochemical Defendants knew and/or should have known that it was substantially certain that their alleged acts and omissions described in this Complaint would cause injury and damage, including contamination of the wells within Plaintiff's service area with PFAS.

404.    The Fluorochemical Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of PFAS and/or products that contain PFAS and maximize profits, in conscious disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon health, property and the environment, including wells within Plaintiff's service area. Therefore, Plaintiff also requests an award of exemplary damages in an amount that is sufficient to punish the Fluorochemical Defendants and that fairly reflects the aggravating circumstances alleged herein.

405.    On information and belief, New DuPont and Corteva contractually assumed Old DuPont's liabilities for this claim.

## FLUOROCHEMICAL PRODUCT LIABILITY

### TWELFTH CAUSE OF ACTION
### Liability of 3M for Operation of Monrovia Facilities for Negligence
### (By Plaintiff against 3M)

406.    Plaintiff repeats and restates the allegations set forth in all the previous paragraphs of this Complaint as if fully set forth herein.

407.    3M had a duty to use due care in the handling, control, disposal, release, remediation, and use of PFAS at and from its Monrovia Facilities. 3M negligently, carelessly, and recklessly handled, controlled, failed to control, disposed, released, remediated, or failed to remediate, and use PFAS, and products containing PFAS, that it had contaminated, threatened,

and polluted the water supply serving wells within Plaintiff's service area, resulting in the damages alleged in this complaint.

408.    3M, among other things, negligently, carelessly, and recklessly failed to, and is negligently, carelessly, and recklessly failing to (i) prevent spills, leaks, disposal, discharges and releases of PFAS through the use of appropriate technology; (ii) install and maintain systems to prevent spills, leaks, disposal, discharges, and releases, and facilitate prompt detection and containment of any spills, leaks, disposal, discharges, and releases; (iii) monitor and discover spills, leaks, disposal, discharges, and releases as soon as possible; (iv) warn those who may be injured as a result of spills, leaks, disposal, discharges and releases; and (v) clean up, contain and abate spills, leaks, disposal, discharges, and releases to prevent harm and injury to the Plaintiff.

409.    3M knew, or should have known, that its activities would spill, leak, discharge, and release PFAS into the soil and contaminate surface water and groundwater.

410.    As a direct and proximate result of 3M's past and ongoing acts and omissions as alleged herein, Plaintiff has incurred, including but not limited to within the three years preceding the filing of this lawsuit, is incurring, and will continue to incur, investigation, remediation, treatment, and disposal costs and expenses required to restore drinking water resources, and other damages as alleged herein, in an amount to be proved at trial.

411.    3M knew and/or should have known that it was substantially certain that its alleged acts and omissions described in this Complaint would cause injury and damage, including contamination of the wells within Plaintiff's service area with PFAS.

412.    3M committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed in conscious disregard of the probable dangerous consequences of that conduct and its foreseeable impact

upon health, property and the environment, including the wells within Plaintiff's service area. Therefore, Plaintiff also requests an award of exemplary damages in an amount that is sufficient to punish 3M and that fairly reflects the aggravating circumstances alleged herein.

### THIRTEENTH CAUSE OF ACTION
### Liability of 3M for Operation of Monrovia Facilities for Continuing Trespass
### (By Plaintiff against 3M)

413.    Plaintiff repeats and restates the allegations set forth in all the previous paragraphs of this Complaint as if fully set forth herein.

414.    Plaintiff has protectable legal interests in the groundwater within the Basins, including the right to replenish the aquifer and to recover the costs of performing these services from anyone who appropriates groundwater in Plaintiff's service area.

415.    3M's manufacturing activities at the Monrovia Facilities since approximately the 1980s give rise to its liability in this cause of action.

416.     Based on information and belief, 3M's Monrovia Fluorochemical Products have contained and/or do contain PFAS, during the time between the 1980s and today.

417.    3M's researching, designing, formulating, handling, disposing, manufacturing, labeling, using, testing, distributing, promoting, marketing, and selling 3M Monrovia Fluorochemical Products that contain PFAS resulted in contamination of the environment, including the groundwater serving wells within Plaintiff's service area, thereby causing damage to Plaintiff.

418.    3M intentionally, recklessly, or negligently caused PFAS to enter the surface water, groundwater, replenishment water, and drinking water supply, and 3M knew or should have known that the use and disposal of those compounds and products would contaminate the surface water, groundwater, replenishment water, and drinking water supply. Thus, 3M

intentionally, recklessly, negligently or as the result of engaging in an extra-hazardous activity, was a substantial factor in causing noxious and hazardous contaminants and pollutants to enter the surface water, groundwater, replenishment water, and drinking water supply.

419.    PFAS released, deposited, or disposed of by 3M at the 3M Monrovia Facilities continues to be located on or in Plaintiff's service area, and the surface water, groundwater, and replenishment water serving Plaintiff's service area drinking water supply.

420.    Plaintiff did not and does not consent to the trespass alleged herein. 3M individually knew or reasonably should have known that Plaintiff would not consent to this trespass.

421.    Contamination of wells within Plaintiff's service area alleged herein has not yet ceased. PFAS continues to migrate into and enter wells within Plaintiff's service area.

422.    As a direct and proximate result of 3M's acts and omissions as alleged herein, wells within Plaintiff's service area have been and continue to be contaminated with PFAS, causing Plaintiff significant injury and damage.

423.    Plaintiff has incurred, is incurring, and will continue to incur, investigation, treatment, remediation, monitoring, and disposal costs and expenses related to the contamination of the wells within Plaintiff's service area in an amount to be proved at trial.

424.    As a further direct and proximate result of 3M's acts and omissions as alleged herein, Plaintiff seeks the reasonable costs of repair or restoration of all of Plaintiff's property to its original condition, costs associated with recovering the possession, any benefits or profits obtained by 3M related to the trespass under *Starrh & Starrh Cotton Growers v. Aera Energy LLC* (2007) 153 Cal. App. 4th 583, and all other damages and remedies allowable under California Civil Code § 3334 and California law.

425.     3M knew and/or should have known that it was substantially certain that its alleged acts and omissions described in this Complaint would cause injury and damage, including contamination of surface water, groundwater, replenishment water, and drinking water supply with PFOA and PFOS.

426.     3M committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed in conscious disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon health, property, and the environment, including the wells within Plaintiff's service area. Therefore, Plaintiff also requests an award of exemplary damages in an amount that is sufficient to punish 3M and that fairly reflects the aggravating circumstances alleged herein.

## FOURTEENTH CAUSE OF ACTION
### Liability of 3M for Operation of Monrovia Facilities for Public and Private Nuisance
### (By Plaintiff against 3M)

427.     Plaintiff repeats and restates the allegations set forth in all the previous paragraphs of this Complaint as if fully set forth herein.

428.     3M's manufacturing activities at the Monrovia Facilities since approximately the 1980s give rise to its liability in this cause of action.

429.      Based on information and belief, 3M's Monrovia Fluorochemical Products have contained and/or do contain PFAS, during the time between the 1980s and today.

430.     3M's researching, designing, formulating, handling, disposing, manufacturing, labeling, using, testing, distributing, promoting, marketing, and selling 3M Monrovia Fluorochemical Products that contain PFAS resulted in contamination of the environment, including groundwater in the vicinity of wells within Plaintiff's service area.

431.     Such contamination is a public nuisance as defined in California Civil Code

section 3479, California Civil Code section 3480, California Health and Safety Code section 5410, and California Water Code section 13050, and is reasonably abatable and varies over time.

432.    3M's actions constitute a nuisance in that the contamination of groundwater and drinking water is injurious to public health, is indecent or offensive to the sense and is an obstruction to the Plaintiff's free use of its water rights. The contamination of the wells within Plaintiff's service area, surface water, and groundwater significantly affects a considerable number of people in an entire community. Plaintiff did not and does not consent to the public nuisance alleged herein. Defendants knew or reasonably should have known that Plaintiff would not consent to the public nuisance. As a direct and proximate result of the nuisance, Plaintiff has been damaged within the three years preceding the filing of the lawsuit and is entitled to the compensatory damages alleged herein in an amount to be proven at trial or to such other appropriate relief as Plaintiff may elect at trial, including but not limited to, equitable relief in the form of an order requiring 3M to abate the nuisance.

433.    3M was at all relevant times aware that PFAS compounds will likely be discharged to the environment in a manner that will create a nuisance and failed to properly use and dispose of such contaminants in such a manner that not create or contribute to the creation of a nuisance.

434.    By 3M's operation, management, and maintenance of the 3M Monrovia Facilities, it knew, or should have known, of the harmful effects and adverse impacts that exposure to PFAS would have on the environment and human health.

435.    By 3M's operation, management, and maintenance of the 3M Monrovia Facilities, it caused or contributed to the creation of the nuisance at issue by releasing or disposing of products and materials containing PFAS in a manner that 3M knew or should have known would

result in the contamination of the wells within Plaintiff's service area.

436.    3M's conduct was a substantial factor is causing the harm suffered by Plaintiff as a result of the contamination nuisance described herein. As a result of 3M's acts and omissions as alleged herein, wells within Plaintiff's service area have been, and continue to be, contaminated with PFAS, causing Plaintiff significant injury and damage. As a result of 3M's acts and omissions as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur, investigation, treatment, remediation, monitoring, and disposal costs and expenses related to the PFAS contamination of the wells within Plaintiff's service area in an amount to be proved at trial.

437.    Furthermore, as a result of 3M's acts and omissions as alleged herein, the contamination of the wells within Plaintiff's service area, constitutes a continuing public nuisance because it is reasonably abatable and because the groundwater contamination at issue continues to migrate, move, and spread onto, into, across, and through the Plaintiff's service area, and its impact has thus varied, and continues to vary, over time.

438.    3M has continued and will continue, unless restrained by this Court, to maintain the nuisance by failing to investigate, remove, and remediate the environmental contamination for which it is responsible. Unless 3M is restrained by order of this Court from continuing its nonresponsive course of conduct and failure to abate the contamination they have caused, it will be necessary for the Plaintiff to commence many successive actions against 3M, to secure compensation for damage sustained, thus requiring a multiplicity of suits.

439.    3M is responsible to take such action as is necessary to abate the public nuisance and to take such action as is necessary to ensure that the PFAS that contaminate the groundwater within Plaintiff's service area do not present a risk to the public.

440.    Plaintiff has been specially damaged because 3M's acts and omissions have unreasonably interfered with, and continue to interfere with, Plaintiff's free use of its water resources has suffered and continues to suffer significant damages and injuries, including but not limited to, investigation, sampling, remediation, treatment system design, acquisition, installation, operations and maintenance, and other costs and damages related to contaminated wells within Plaintiff's service area.

441.    Plaintiff did not and does not consent to the public nuisance alleged herein. 3M knew or reasonably should have known that Plaintiff would not consent to this public nuisance.

442.    3M knew and/or should have known that it was substantially certain that its alleged acts and omissions described in this Complaint would cause injury and damage, including contamination of the wells within Plaintiff's service area with PFAS.

443.    3M committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed in conscious disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon health, property, and the environment, including the wells within Plaintiff's service area. Therefore, Plaintiff also requests an award of exemplary damages in an amount that is sufficient to punish 3M and that fairly reflects the aggravating circumstances alleged herein.

**FIFTEENTH CAUSE OF ACTION**
**Declaratory Relief**
**(By Plaintiff against All Defendants)**

444.    Plaintiff repeats and restates the allegations set forth in all previous paragraphs of this Complaint as if fully set forth herein.

445.    Defendants knew, or should have known, that AFFF, when used in a foreseeable and intended manner, was dangerous and created an unreasonable and excessive risk of harm to human health and the environment.

446.    Defendants intentionally, willfully, deliberately and/or negligently failed to properly warn, train, handle, control, dispose, and release noxious and hazardous contaminants and pollutants, such that Defendants created substantial and unreasonable threats to human health and the environment, which resulted from the foreseeable and intended use and storage of AFFF and products containing fluorosurfactants and fluorochemicals.

447.    Among other things, Plaintiff must take costly remedial action to remove PFAS contamination which will result in substantial costs, expenses and damages in an amount to be proved at trial.

448.    These Defendants, and each of them, have failed to reimburse Plaintiff for the cost of investigation, remediation, cleanup, and disposal costs and/or deny any responsibility or liability for these damages and expenses Plaintiff will incur in the future.

449.    An actual controversy exists concerning who is financially responsible for abating actual or threatened pollution or contamination of groundwater resources and wells within Plaintiff's service area by PFAS.

450.    In order to resolve this controversy, Plaintiff seeks an adjudication of the respective rights and obligations of the parties, and other relief to the extent necessary to provide full relief.

**SIXTEENTH CAUSE OF ACTION**
**California Civil Code Sec. 3439.04(a)(1) (2004) and Delaware Code tit. 6 Sec. 1304(a)(1)**
**Actual Fraudulent Transfer in Relation to Chemours Spinoff**
**(By Plaintiff against Old DuPont, Chemours, New DuPont, and Corteva)**

451.    Plaintiff repeats and restates the allegations set forth in all previous paragraphs of this Complaint as if fully set forth herein.

452.    Plaintiff seeks equitable and other relief pursuant to the UFTA, against Old DuPont and Chemours.

453.    Through its participation in the Chemours spinoff, as detailed above, Chemours transferred valuable assets to DuPont, including the $3.9 billion dividend (the "Chemours Transfers"), while simultaneously assuming significant liabilities pursuant to the Separation Agreement (the "Chemours Assumed Liabilities").

454.    The Chemours Transfers and Chemours Assumed Liabilities were made for the benefit of Old DuPont.

455.    At the time that the Chemours Transfers were made and the Chemours Assumed Liabilities were assumed, and until the Chemours Spinoff was complete, Old DuPont was in a position to, and in fact did, control and dominate Chemours.

456.    Old DuPont and Chemours acted with the actual intent to hinder, delay, and defraud creditors or future creditors.

457.    Plaintiff has been harmed as a result of the Chemours Transfers.

458.    Old DuPont and Chemours engaged in acts in furtherance of a scheme to transfer its assets out of the reach of parties such as the Plaintiff has been damaged as a result of the actions described in this Complaint.

459.    Pursuant to the UFTA and Delaware Code tit. 6 Sec. 1301 to 1312, Plaintiff seeks to avoid the Chemours Transfers and to recover property or value that Chemours transferred to Old DuPont.

460.    Upon information and belief, Corteva and New DuPont assumed Old DuPont's liability described above.

461.    Plaintiff further reserves such other rights and remedies that may be available under the UFTA as may be necessary to fully compensate Plaintiff for the damages and injuries suffered as alleged in this Complaint.

## SEVENTEENTH CAUSE OF ACTION
**California Civil Code Sec. 3439.04(5) (2004) and Delaware Code tit. 6 Sec. 1305**
**Constructive Fraudulent Transfer In Relation To Chemours Spinoff**
**(By Plaintiff against Old DuPont, Chemours, New DuPont, and Corteva)**

462.    Plaintiff repeats and restates the allegations set forth in all previous paragraphs of this Complaint as if fully set forth herein.

463.    Plaintiff seeks equitable and other relief pursuant to the UFTA against Old DuPont and Chemours

464.    Chemours did not receive reasonably equivalent value from Old DuPont in exchange for the Chemours Transfers and Chemours Assumed Liabilities.

465.    Each of the Chemours Transfers and Chemours' assumption of the Chemours Assumed Liabilities was made to or for the benefit of Old DuPont.

466.    At the time that the Chemours Transfers were made and the Chemours Assumed Liabilities were assumed, and until the Spinoff was complete, DuPont was in a position to, and in fact did, control and dominate Chemours.

467.    Chemours made the Chemours Transfers and assumed the Chemours Assumed Liabilities when it was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business and debt obligations.

468.    Chemours was insolvent at the time or became insolvent as a result of the Chemours Transfers and its assumption of the Chemours Assumed Liabilities.

469.    At the time that the Chemours Transfers were made and Chemours assumed the Chemours Assumed Liabilities, Chemours intended to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

470.    Plaintiff has been harmed as a result of the Chemours Transfers.

471.    Pursuant the UFTA and Delaware Code tit. 6 Sec. 1301 to 1312, Plaintiff seeks to avoid the Transfers and to recover property or value transferred to Old DuPont.

472.    Upon information and belief, Corteva and New DuPont assumed Old DuPont's liability described above.

473.    Plaintiff further reserves such other rights and remedies that may be available under the UFTA and UVTA as may be necessary to fully compensate Plaintiff for the damage and injuries suffered as alleged in this Complaint.

## EIGHTEENTH CAUSE OF ACTION
**California Civil Code section 3439.04(a)(1)(2016) and Delaware Code tit. 6 Sec. 1304(a)(1)
Actual Fraudulent Transfer in Relation to Dow-DuPont Merger and
Subsequent Restructurings, Asset Transfers and Separations
(By Plaintiff against Old DuPont, New DuPont, and Corteva)**

474.    Plaintiff repeats and restates the allegations set forth in all previous paragraphs of this Complaint as if fully set forth herein.

475.    Plaintiff seeks equitable and other relief pursuant to the UVTA against Old DuPont, New DuPont, and Corteva.

476.    Following the Dow-DuPont Merger, and through the separations of New DuPont, New Dow, and Corteva, Old DuPont sold or transferred, directly or indirectly, valuable assets and business lines to Corteva and New DuPont (the "Old DuPont Transfers").

477.    The Old DuPont Transfers were made for the benefit of New DuPont or Corteva.

478.    At the time that the Old DuPont Transfers were made, New DuPont was in a position to, and in fact did, control and dominate Old DuPont and Corteva.

479.    Old DuPont, New DuPont, and Corteva acted with the actual intent to hinder, delay, and defraud creditors or future creditors.

480.    Plaintiff has been harmed as a result of the Old DuPont Transfers.

481.     Old DuPont engaged in acts in furtherance of a scheme to transfer its assets out of the reach of parties such as the Plaintiff that has been damaged as a result of the actions described in this Complaint.

482.     Pursuant to the UVTA and Delaware Code tit. 6 Sec. 1301 to 1312, Plaintiff seeks to avoid the Transfers and to recover property or value transferred to New DuPont and Corteva.

483.     Pursuant to the UVTA and Delaware Code tit. 6 Sec. 1301 to 1312, Plaintiff also seeks to enjoin New DuPont and Corteva, as transferees, from distributing, transferring, capitalizing, or otherwise disposing of any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to Old DuPont, and seeks a constructive trust over such proceeds for the benefit of Plaintiff.

484.     Plaintiff further reserves such other rights and remedies that may be available under the UVTA as may be necessary to fully compensate Plaintiff for the damage and injuries suffered as alleged in this Complaint.

### NINETEENTH CAUSE OF ACTION
**California Civil Code section 3439.04(5)(2016) and Delaware Code tit. 6 Sec. 1305 Constructive Fraudulent Transfer in Relation to Dow-DuPont Merger and Subsequent Restructurings, Asset Transfers and Separations (By Plaintiff against Old DuPont, New DuPont, and Corteva)**

485.     Plaintiff repeats and restates the allegations set forth in all previous paragraphs of this Complaint as if fully set forth herein.

486.     Plaintiff seeks equitable and other relief pursuant to the UVTA against Old DuPont, New DuPont, and Corteva.

487.     Old DuPont did not receive reasonably equivalent value from New DuPont and Corteva in exchange for the Old DuPont Transfers.

488.     Each of the Old DuPont Transfers was made to or for the benefit of New DuPont or Corteva.

489.    At the time that the Old DuPont Transfers were made, New DuPont was in a position to, and in fact did, control and dominate Old DuPont and Corteva.

490.    Old DuPont made the Old DuPont Transfers when it was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business.

491.    Old DuPont was insolvent at the time or became insolvent as a result of the Old DuPont Transfers.

492.    At the time that the Old DuPont Transfers were made, Old DuPont intended to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

493.    Plaintiff has been harmed as a result of the Old DuPont Transfers.

494.    Pursuant to the UVTA and Delaware Code tit. 6 Sec. 1301 to 1312, Plaintiff seeks to avoid the Transfers and to recover property or value transferred to New DuPont and Corteva.

495.    Pursuant to the UVTA and Delaware Code tit. 6 Sec. 1301 to 1312, Plaintiff also seeks to enjoin New DuPont and Corteva, as transferees, from distributing, transferring, capitalizing, or otherwise disposing of any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to Old DuPont, and seeks a constructive trust over such proceeds for the benefit of Plaintiff.

496.    Plaintiff further reserves such other rights and remedies that may be available under the UVTA as may be necessary to fully compensate the Plaintiff for the damage and injuries suffered as alleged in this Complaint.

**TWENTIETH CAUSE OF ACTION**
**WRD Act Section 60224**
**(By Plaintiff against all Defendants)**

497.    Plaintiff repeats and restates the allegations set forth in all previous paragraphs of

this Complaint as if fully set forth herein.

498.    The WRD Act authorizes Plaintiff, for the purpose of protecting and preserving the groundwater supplies within the district for beneficial uses, to "take any action, within the district, including, but not limited to, capital expenditures and legal actions, which in the discretion of the board is necessary or desirable to accomplish any of the following: (a) Prevent contaminants from entering the groundwater supplies of the district, whether or not the threat is immediate. (b) Remove contaminants from the groundwater supplies of the district. (c) Determine the existence, extent, and location of contaminants in, or which may enter, the groundwater supplies of the district. (d) Determine persons, whether natural persons or public entities, responsible for those contaminants. (e) Perform or obtain engineering, hydrologic, and scientific studies for any of the foregoing purposes." Water Code § 60224.

499.    The Act further provides Plaintiff the ability to sue and recover the amount of any district expenditures under Section 60224 from those responsible for the contaminants causing expenditures. Water Code, § 60226. If successful, Plaintiff may recover reasonable attorney's fees and court costs. *Id.*; *see also* § 60230.

500.    Plaintiff's Board of Directors (the "Board") has determined that investigation and remedial work is required given the magnitude of PFAS contamination and the potential impacts to public health, as described in this Complaint, and that prompt action is needed and legally required to clean up or contain the contamination or pollution, abate the effects of the contamination or pollution, or take other remedial action to prevent, abate, contain, and dispose of threatened and existing contamination. The Board has authorized the expenditure of funds to conduct such investigation and remediation and has authorized action to recover all costs and damages associated with such contamination.

501.     Defendants caused Plaintiff to conduct investigations into the quality of the groundwater within Plaintiff's territorial jurisdiction to determine whether those waters are contaminated or polluted with PFAS at a substantial cost to Plaintiff in an amount to be proved at trial.

502.     Defendants caused Plaintiff to perform cleanup, abatement, and/or remedial work needed to prevent, abate, and/or contain threatened or existing contamination of, or pollution to, the groundwater, including the aquifer, within Plaintiff's territorial jurisdiction, all at a substantial cost to Plaintiff an amount to be proved at trial.

503.     In addition, the actions of 3M through the operation, management, and maintenance of the 3M Monrovia facilities were a substantial factor in causing the contamination of the groundwater, and have caused Plaintiff to perform cleanup, abatement, and/or remedial work needed to prevent, abate, and/or contain threatened or existing contamination of, or pollution to, the groundwater, including the aquifer, within Plaintiff's territorial jurisdiction, all at a substantial cost to Plaintiff in an amount to be proved at trial.

504.     As a direct and proximate cause of the Defendants' acts and omission, Plaintiff initiated a program to assess, evaluate, investigate, monitor, abate, clean up, correct, contain the contamination of the aquifer and remove PFAS from drinking water being served to citizens and businesses, and/or take other necessary remedial action, all at significant expense, cost, loss, and damage in amounts to be proved at trial.

505.     As a direct and proximate result of the acts and omissions alleged in this Complaint, Plaintiff has and/or will incur substantially increased expenses, all to Plaintiff's damage, in an amount to be proved at trial. Plaintiff has and will incur costs and attorney's fees prosecuting this action. Plaintiff is entitled to recover all such damages, together with court costs

and reasonable attorney's fees, in this action.

506.    As a direct and proximate result of the Defendants' conduct, Plaintiff is entitled to recover all past, present, and future response costs, together with interest from the Defendants, as well as damages for injury, loss, and damages to natural resources.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.    Enter judgment in its favor and against Defendants on each Count of this Complaint;

B.    An order that Defendants pay all damages suffered by Plaintiff, including but not limited to investigation, clean-up, abatement, remediation, and monitoring costs incurred by Plaintiff, or for which Plaintiff is or was legally responsible, to comply with California's Notification and Response Levels, and ultimately, its MCLs;

C.    An order that Defendants are required to abate the nuisance Defendants have caused;

D.    An order voiding the Chemours Transfers and the DuPont Transfers to the extent necessary to satisfy Plaintiff's claims;

E.    An order enjoining New DuPont from distributing, transferring, capitalizing, or otherwise transferring any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to Old DuPont;

F.    An order imposing a constructive trust over any such proceeds for the benefit of the Plaintiff;

G.    An award to Plaintiff for the costs of this suit (including but not limited to expert fees) and reasonable attorneys' fees, as provided by law;

H.    An award for punitive damages; and

I.    An award for such other and further relief as the nature of this case may require or as this court deems just, equitable and proper.

### DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a jury trial.


Dated: November 8, 2021                          Respectfully submitted,

                                                 By Its Attorneys,


                                                 */s/ Ashley B. Campbell*
                                                 Kenneth A. Sansone
                                                 Ashley B. Campbell
                                                 SL ENVIRONMENTAL LAW GROUP PC
                                                 175 Chestnut Street
                                                 San Francisco, CA 94133
                                                 Telephone: (603) 227-6929
                                                 Facsimile: (415) 366-3047
                                                 ksansone@slenvironment.com
                                                 acampbell@slenvironment.com

                                                 Robert A. Bilott
                                                 TAFT STETTINIUS & HOLLISTER LLP
                                                 425 Walnut Street, Suite 1800
                                                 Cincinnati, OH 45202-3957
                                                 Telephone: (513) 381-2838
                                                 Facsimile: (513) 381-0205
                                                 bilott@taftlaw.com

                                                 David J. Butler
                                                 TAFT STETTINIUS & HOLLISTER LLP
                                                 65 East State Street, Suite 1000
                                                 Columbus, Ohio 43215
                                                 Telephone: (614) 221-2838
                                                 Facsimile: (614) 221-2007
                                                 dbutler@taftlaw.com

William J. Jackson
John D.S. Gilmour
Andrew W. Homer
KELLEY DRYE & WARREN LLP
515 Post Oak Blvd., Suite 900
Houston, TX 77027
Telephone: (713) 355-5000
Facsimile: (713) 355-5001
bjackson@kelleydrye.com
jgilmour@kelleydrye.com
ahomer@kelleydrye.com

Kevin J. Madonna
KENNEDY & MADONNA, LLP
48 Dewitt Mills Road Hurley, NY 12443
Telephone: (845) 481-2622
Facsimile (845) 230-3111
kmadonna@kennedymadonna.com

Gary J. Douglas
Michael A. London
Rebecca G. Newman
Tate J. Kunkle
DOUGLAS & LONDON, P.C.
59 Maiden Ln, 6th Fl,
New York, NY 10038
Telephone: (212) 566-7500
gdouglas@douglasandlondon.com
mlondon@douglasandlondon.com
rnewman@douglasandlondon.com
tkunkle@douglasandlondon.com

Ned McWilliams
LEVIN PAPANTONIO THOMAS
MITCHELL RAFFERTY PROCTOR,
BUCHANAN O'BRIEN BARR,
MOUGEY, P.A.
316 S. Baylen St.
Pensacola, Florida 32502
Telephone: (850) 435-7138
nmcwilliams@levinlaw.com